939 F.2d 1323
 30 Wage & Hour Cas. (BN 711, 119 Lab.Cas. P 35,531
 Bonnie BOUCHARD; Rodney Wacker, Vicki Danowicz; Gary
Sexton, Jack D. Yates, Jr.; Lawrence E. Yates; Ila Fett;
Rosemarie Steel; Daniel J. Rosey; Phyllis Hensley; Kevin
Carlson; Jean Peters; Tammy Sue Empfield; Leo F. Prokop,
Jr.; Doris Jean Meyer; and Patrick K. Bouchard, Appellees,
v.
The REGIONAL GOVERNING BOARD OF REGION V MENTAL RETARDATION
SERVICES and Region V Mental Retardation Services,
Appellants.
Kevin HUSS; Chris Amundson; and Jerry Junker, Appellees,
v.
The REGIONAL GOVERNING BOARD OF REGION V MENTAL RETARDATION
SERVICES, in the official capacity, and Region V
Mental Retardation Services, Appellants.
 Nos. 90-2015 and 90-2016.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 9, 1991.
Decided July 25, 1991.
 
 David Buntain, Lincoln, Neb., for appellants.
 Mary Wickenkamp, Lincoln, Neb., for appellees.
 John Macintosh, Concord, N.H., amicus curiae.
 Before LAY, Chief Judge, and MAGILL and LOKEN, Circuit Judges.
 LOKEN, Circuit Judge.
 
 
 1
 In this Fair Labor Standards Act ("FLSA") case, defendant Region V Mental Retardation Services ("Region V"), a political subdivision of Nebraska, appeals from a judgment awarding over $300,000 in unpaid overtime compensation and attorneys fees to twenty present and former Life Skill Trainers ("LSTs") employed at residential facilities for the mentally retarded in Fairbury, Nebraska. Plaintiffs cross appeal from the district court's refusal to award liquidated damages equal to the amount of the unpaid compensation. In rejecting Region V's defense that it relied in good faith upon written interpretations of the FLSA by the Wage and Hour Division of the U.S. Department of Labor (the "Department"), see 29 U.S.C. Sec. 259, the district court applied a legal standard subsequently rejected by this court in Hultgren v. County of Lancaster, 913 F.2d 498 (8th Cir.1990). Accordingly, we reverse the judgment in favor of all plaintiffs except Gary Sexton.
 
 
 2
 Plaintiffs brought this action under the private remedies section of the FLSA, 29 U.S.C. Sec. 216(b), alleging they were entitled to be compensated for all "sleep time" spent on the premises of Region V facilities from April 15, 1986, when the FLSA became applicable to public agencies, see Pub.L. 99-150, 99 Stat. 787 (1985), until November 1989, when Region V adopted a new compensation schedule that eliminated this issue. The district court held that all disputed sleep time was compensable under the Department's applicable regulations, an issue that, for the most part, we need not reach on appeal given our disposition of the Sec. 259 defense.
 
 
 3
 The district court further rejected Region V's defense under Sec. 259, concluding that the defense may not be based upon letter rulings issued by "lesser officials" of the Department. For the reasons explained below, we disagree and hold that, except as to Gary Sexton, the Sec. 259 defense was proved. Finally, the district court held that plaintiffs were not entitled to liquidated damages because Region V had proved the good faith defense to such damages under 29 U.S.C. Sec. 260. Our resolution of the Sec. 259 issue makes it unnecessary to address separately the Sec. 260 defense.
 
 I.
 
 4
 During the relevant period, Region V's residential facilities each housed from two to four mentally retarded adults in private homes or apartments in the Fairbury community. One or two LSTs resided in each group home when the mentally retarded clients were present. LSTs instructed the clients in social skills necessary for independent living; they also prepared meals, administered medication, reported on each client's needs and progress, and were generally responsible for the clients' safety and well-being at the group home.
 
 
 5
 The plaintiff LSTs fell into three categories. Weekday LSTs worked at the group homes from Monday afternoon until Friday morning or, later in the damage period, early Friday afternoon. They left the premises only when the clients attended workshops elsewhere. Weekend LSTs were at the group homes with their clients continuously from Friday afternoon until Monday morning. Substitute LSTs replaced either weekday or weekend LSTs and worked the same schedule as the LSTs being replaced. Because of the intricacies of the FLSA sleep time issue, each category of plaintiffs was separately analyzed by the district court and by the parties on appeal.
 
 
 6
 Prior to 1985, Region V LSTs were paid on a salary basis. In February 1985, the Supreme Court held that the FLSA is generally applicable to state and local governmental units such as Region V. Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016. Following Garcia, Region V concluded that its LSTs must be converted to hourly employees subject to the minimum wage and maximum hour (overtime) requirements of the FLSA, 29 U.S.C. Secs. 206, 207.
 
 
 7
 Accordingly, Region V administrators obtained wage and hour publications from the Department and received other interpretive materials from the National Association of Private Residential Resources ("NAPRR"), an association of agencies that provide community-based residential support services to some 40,000 mentally retarded and developmentally disabled persons.[1] After reviewing these materials, Region V developed a compensation schedule for the LSTs and prepared a standard Employment Agreement adapted from a form of agreement obtained from NAPRR. Region V counsel approved this form of agreement, and in mid-1985 a copy of the agreement was presented to and signed by each Region V LST. In October 1988, responding to an Enforcement Policy issued by the Department, Region V prepared, with counsel's approval, a revised Employment Agreement containing somewhat modified LST work schedules. The revised agreement was again presented to and signed by each LST. In this lawsuit, plaintiffs claim that Region V violated FLSA because the work schedules in the Employment Agreements provided (with exceptions explained below) that LSTs must spend eight hours of uncompensated sleep time on the premises of the group home each night.
 
 II.
 
 8
 The FLSA requires that covered employees be paid at least the prescribed minimum hourly wage and receive at least 1 1/2 times their regular hourly wage for overtime hours. 29 U.S.C. Secs. 206, 207. The amount of money an employee must be paid under FLSA cannot be determined without knowing the number of hours worked. In two of its early landmark FLSA decisions, the Supreme Court considered when an employer must compensate for sleep time and other on-premises waiting time that the employer would prefer to designate as "off duty." In Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), the Supreme Court held that on-premises "time spent in playing cards and other amusements, or in idleness" must be compensated because the employer's fire guards had been hired "to do nothing but wait for something to happen," 323 U.S. at 132, 133, 65 S.Ct. at 168. However, the district court's decision to exclude the employees' on-premises time "for sleep and for eating" from the FLSA computation was not at issue, 323 U.S. at 129, 65 S.Ct. at 166.
 
 
 9
 In Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), decided the same day as Armour, sleep time was included in the waiting time at issue. In reversing a decision that no waiting time was compensable, the Supreme Court held that whether waiting time and sleep time must be compensated in a particular case is a question of fact which:
 
 
 10
 involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances.... The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.
 
 
 11
 323 U.S. at 137, 65 S.Ct. at 163. The Court noted that the Department had filed an amicus brief urging "the exclusion of sleeping and eating time ... and the inclusion of all other on-call time," 323 U.S. at 139, 65 S.Ct. at 164. Without accepting or rejecting this conclusion, the Court stated, "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140, 65 S.Ct. at 164.
 
 
 12
 An employer charged with violating the minimum wage or maximum hour provisions of FLSA is given an affirmative defense in Sec. 259, which provides that,
 
 
 13
 no employer shall be subject to any liability ... for ... failure ... to pay minimum wages or overtime compensation ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Department] ... or any administrative practice or enforcement policy....
 
 
 14
 Section 259 was enacted in 1947 in response to Congress' perception that the FLSA "has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation," 29 U.S.C. Sec. 251(a). Thus, the deference to employment agreements mandated by the Supreme Court in Skidmore is particularly appropriate in the context of the Sec. 259 good faith defense.
 
 
 15
 In 1961, the Department issued an interpretive bulletin that is now Part 785 of the Wage and Hour Division Regulations, 29 C.F.R. Part 785, discussing what constitutes compensable work time for FLSA purposes. Several provisions deal with sleep time issues. 29 C.F.R. Secs. 785.20-.23. Beginning in 1980, in response to inquiries from trade associations such as NAPRR, the Department issued a series of letter rulings applying its regulations to the sleep time of "houseparents" at "community residences for the mentally retarded." In January 1988, the Department suspended its numerous compliance investigations of group homes around the country[2] to develop a consistent enforcement policy. On June 30, 1988, the Department promulgated an Enforcement Policy "refining and restating" the interpretations set forth in its earlier letter rulings. This Enforcement Policy expressly stated that the Department "will not initiate any new investigations of residential care facilities which involve only an assertion that improper sleep time deductions are being made by a group home employer until 90 days from the date of this enforcement policy statement."
 
 
 16
 Under the FLSA, this moratorium on public enforcement did not preclude Sec. 216(b) private actions such as this. However, it reflected the agency's judgment that the difficult compliance questions facing this industry should be resolved by prospective enforcement. Therefore, the district court's decision to award substantial retroactive overtime liability against this public agency defendant must be "justified by very good reasons," Skidmore, 323 U.S. at 140, 65 S.Ct. at 164.
 
 III.
 
 17
 In 1985, when Region V obtained interpretive materials from the NAPRR, developed the hours-worked schedules for LSTs and prepared the standard Employment Agreement signed by each LST, it relied upon three letter rulings issued by the Department that dealt with this industry. In rejecting the Sec. 259 defense, the district court held that Region V was not entitled to rely upon these rulings because they were signed by a Deputy and an Assistant Administrator who were "lesser officials within the agency." The district court then concluded that Region V had not acted "in good faith in conformity with" the regulations, based upon the court's own interpretation of the regulations rather than the Department's interpretation as reflected in the letter rulings.
 
 
 18
 This court's subsequent decision in Hultgren held that the Deputy and Assistant Administrator's letter rulings, including two of the same letters at issue here, "may properly be characterized as the position of the agency for purposes of section 259," 913 F.2d at 507. Thus, the district court erred in limiting its Sec. 259 inquiry to the regulations alone. We must consider whether Region V met the good faith reliance standards under Sec. 259, taking into account both the Department's regulations and the agency's letter rulings. The good faith test under Sec. 259 is an objective one. Hultgren, supra, 913 F.2d at 507. We conclude that Region V proved the Sec. 259 defense with respect to each of the three categories of LSTs.
 
 
 19
 Weekday LSTs. These full-time employees remained at Region V premises from Monday afternoon until Friday. Pursuant to the compensation schedule in the Employment Agreements, they were paid for approximately 40 Duty Hours. Unpaid time included "Off Duty Hours," from 8:00 a.m. to 3:30 p.m. each day, when the clients were away from the group homes, and "Evening Hours," defined as the period from 10:00 p.m. to 6:00 a.m. when the LSTs were expected to sleep in private quarters at the group home.
 
 
 20
 Sleep time was not compensated except in two situations: first, if a client needed attention for at least 5-8 minutes during sleep time, the LST would be compensated for the time actually spent on duty; second, on any night when client interruptions totaled three hours or more, the LST would be paid for the entire eight hour sleep time period. LSTs were required to record all such compensable sleep time interruptions on their time cards. They were paid 1 1/2 times their hourly rates for hours worked over 40 per week, including compensable sleep time.
 
 
 21
 Section 785.22 of the Department's sleep time regulations provides that, if an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude "a bona fide regularly scheduled sleeping period of not more than 8 hours" from hours worked. The employer must furnish "adequate sleeping facilities," and sleep time conditions must be such that the employee "can usually enjoy an uninterrupted night's sleep." Sleep time interruptions must be compensated, and the entire sleep period must be compensated "if the employee cannot get at least 5 hours' sleep during the scheduled period." This regulation is based upon decisions such as Skidmore and Rokey v. Day & Zimmermann, Inc., 157 F.2d 734 (8th Cir.1946), cert. denied, 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288 (1947).
 
 
 22
 Section 785.23 of the regulations broadens the sleep time exception for an employee who resides on the employer's premises for "extended periods of time." Consistent with the Supreme Court's admonition in Skidmore, this regulation states, "It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted." This general guideline was clarified with respect to "houseparents sleeping at community residences for the mentally retarded" in a letter ruling of the Deputy Administrator dated February 3, 1981:
 
 
 23
 In general, we take the position that employees who reside on their employer's premises five days a week are considered to reside there "for extended periods of time." Where the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the group home, we would regard such employees as residing there, even though they may have another residence which they may regard as their principal residence.... [W]here employees are on duty for less than 120 hours in a week, they can be considered as residing on the employer's premises, provided that they spend five consecutive days or five consecutive nights on the premises.
 
 
 24
 Region V argues that it was not required to compensate Weekday LSTs for their sleep time (except when interrupted) because these employees resided on the employer's premises for extended periods of time within the meaning of Sec. 785.23, as interpreted in the February 3, 1981 letter ruling, and because they were properly compensated for sleep time interruptions in accordance with Sec. 785.22.
 
 
 25
 It is apparent that the work schedules for Weekday LSTs reflected in Region V's Employment Agreements were based upon and were in concept consistent with the Department's regulations, as clarified by the Deputy Administrator's letter ruling. Weekday LSTs resided at the Region V group homes for consecutive five day and four night periods.[3] They were provided private sleeping rooms, and the group homes were intended to provide a "home-like environment." The LSTs were compensated for recorded sleep time interruptions and were paid for any eight hour sleep period in which client interruptions totaled three hours or more.
 
 
 26
 The district court nonetheless concluded that Sec. 785.23 was not applicable to the Weekday LSTs because they were on the premises at night to protect the clients, to the employer's benefit, and thus were "engaged to wait" within the meaning of Skidmore. The district court further reasoned that Region V knew that LSTs' sleep time was frequently interrupted by client needs and therefore that the LSTs were engaged to wait within the meaning of Sec. 785.14 of the regulations, thereby precluding a Sec. 259 good faith defense. We disagree.
 
 
 27
 Region V relied upon written agency interpretations specifically addressing working conditions in the group home industry. After considerable study of the industry, the Department issued letter rulings that houseparents who work five day-four night schedules comparable to those of the Weekday LSTs do reside on the employer's premises for extended periods of time within the meaning of Sec. 785.23 and therefore may be afforded, pursuant to a written employment agreement, up to eight hours of unpaid sleep time per day in private quarters on the employer's premises. The Department's interpretation of its own regulation is reasonable on its face and is entitled to deference by the courts and contracting parties. Region V could reasonably assume that the Department was familiar with the nighttime duties of houseparents for the mentally retarded; thus, Region V's reliance upon the February 3, 1981 letter ruling in developing the work schedules contained in its Employment Agreements with the Weekday LSTs was plainly reasonable.
 
 
 28
 The district court's reliance upon Sec. 785.14 of the regulations was misplaced. Section 785.14 deals generally with "Waiting Time." As the Supreme Court decisions in Armour and Skidmore and the position of the Department in those cases make clear, sleep time raises different compensation questions under the FLSA than do other types of waiting time. See also Halferty v. Pulse Drug Co., 864 F.2d 1185, 1189-1191 (5th Cir.1989). Section 785.23 of the regulations specifically addressed the question of sleep time, and the Department's letter rulings clarified the application of the regulation to this industry. None of these letter rulings, including the June 1988 Enforcement Policy, even referred to Sec. 785.14. Under these circumstances, Region V's good faith defense may not be rejected on the basis of a general conclusion that its sleeping employees were engaged to wait within the meaning of Sec. 785.14. Accord, Beaston v. Scotland School for Veterans' Children, 693 F.Supp. 234 (M.D.Pa.1988), aff'd, 869 F.2d 587 (3d Cir.1989). Given Congress' statement of purpose in enacting Sec. 259, "in close cases we should consider the expectations of the contracting parties and the reasonableness of the employer's actions in light of the administrative interpretation in question." Marshall v. Baptist Hosp., 668 F.2d 234, 238 (6th Cir.1981) (where the administrative interpretation was ambiguous, employer that reasonably relied on the Department's specific rule, rather than its indefinite standard, was entitled to the Sec. 259 defense).
 
 
 29
 Appellees argue that the Weekday LSTs never resided on Region V's premises for an extended period of time because they "worked a series of sixteen or seventeen hour shifts." However, the fact that LSTs left the premises during their off duty daytime hours, when the clients were off the premises, did not render Sec. 785.23 of the regulations inapplicable. Region V had to allow the LSTs to use this time effectively for their own purposes, or it would have been compensable hours worked. See 29 C.F.R. Sec. 785.16. Section 785.23 expressly states that an employee who resides on the employer's premises for an extended period of time may have "periods of complete freedom from all duties when he may leave the premises for purposes of his own." Therefore, the fact that Region V's Employment Agreement expressly granted Weekday LSTs such periods of off-duty time is consistent with Sec. 785.23 and does not undermine the Sec. 259 good faith defense.
 
 
 30
 Appellees and the dissent further contend that Region V must be denied the good faith defense because it unilaterally drafted the Employment Agreement and "forced it on" the LSTs. We disagree. The 1985 Employment Agreement essentially codified the parties' prior employment relationship under work schedules adapted to comply with FLSA. It did not obligate LSTs to accept either reduced total compensation, longer hours, or increased responsibilities than they had agreed to work prior to the Garcia decision. The Employment Agreement served the purpose of advising the LSTs in advance of the circumstances under which their sleep time would be compensated. See Ariens v. Olin Mathieson Chem. Corp., 382 F.2d 192, 197 (6th Cir.1967). Region V permitted minor schedule variations for the convenience of individual LSTs, and it obtained the views of LSTs before implementing the revised work schedules contained in the 1988 Employment Agreement.
 
 
 31
 The LSTs had no collective bargaining representative. Region V circulated its proposed Employment Agreements to each LST, and there is no evidence that any LST refused to sign either agreement. In the context of the Sec. 259 defense, we conclude that the Employment Agreements in this case satisfy the standard, under Skidmore, that " 'any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.' " Halferty v. Pulse Drug Co., 821 F.2d 261, 269 (5th Cir.1987) (quoting Skidmore, 323 U.S. at 137, 65 S.Ct. at 163), appeal after remand, 864 F.2d 1185 (5th Cir.1989). Accord, General Elec. Co. v. Porter, 208 F.2d 805, 814 (9th Cir.), cert. denied, 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954). Any other decision would violate Congress' stated purpose not to award employees "windfall payments ... of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay," 29 U.S.C. Sec. 251(a)(4).
 
 
 32
 Finally, the dissent argues that Region V must be denied the Sec. 259 defense because it did not provide the LSTs a "home-like environment." The dissent bases its definition of home-like environment on the Department's June 30, 1988 Enforcement Policy. However, Region V had to comply with FLSA after Garcia in 1985. Thus, the Department's February 1981 letter ruling, upon which Region V's compliance program was based, is far more relevant to the Sec. 259 defense. On the home-like environment question, the February 1981 letter ruling stated:
 
 
 33
 The houseparents and relief staff sleep in private quarters separate from the mentally retarded residents of the group home. The actual facts differ somewhat from facility to facility, but the above despcription sets forth the typical situation as it has been explained to us.
 
 
 34
 * * * * * *
 
 
 35
 Where the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the group home, we would regard such employees as residing there, even though they may have another residence which they may regard as their principal residence. In light of the amount of time they spend at the group home, it is in effect a second residence.
 
 
 36
 * * * * * *
 
 
 37
 We have reached this conclusion [regarding relief employees], which represents a departure from the general rule under 29 CFR 785.21, because of the home-like environment afforded to these employees in community residences, with private quarters and other amenities. Even where employees sleep over for only one or two nights, there are ample facilities to enable them to get a full night's sleep.... [B]ecause of the home-like environment, an exception can be made where employees do in fact get a reasonable night's sleep.
 
 
 38
 It is apparent that the Department's rulings on this subject changed over the 1981-1988 period, from a general pronouncement in 1981 that the home-like environment inherently available in these group homes must include private quarters where LSTs could get a reasonable night's sleep, to detailed specifications in 1988 as to the furniture and the cooking, eating, and bath facilities that had to be provided separately to these employees.
 
 
 39
 The issue here is whether sleep time must be compensated. Where an employee is furnished reasonable sleep facilities under conditions that satisfy Skidmore and the regulations, the Department may not deny the exclusion of sleep time because the employer did not provide employees with other "amenities" unrelated to their sleep time. See Van Dyke v. Bluefield Gas Co., 210 F.2d 620 (4th Cir.1954). Thus, it is clear to us that Region V acted in good faith conformity with the regulations and the Department's February 1981 letter ruling so long as it provided LSTs with a separate sleeping room and the LSTs got at least five hours sleep per night, which Sec. 785.22(b) of the regulations defines as "an uninterrupted night's sleep."
 
 
 40
 Weekend LSTs. These full-time employees were on Region V premises continuously from Friday afternoon to Monday morning. The Employment Agreements provided that all hours between 3:30 p.m. Friday and 8:00 a.m. Monday would be compensated except for sleep time from 10:00 p.m. to 6:00 a.m. each night. Interrupted sleep time was compensable under the same circumstances as for Weekday LSTs.
 
 
 41
 Region V contends that the Weekend LSTs' work schedules were intended to and did in fact meet the Sec. 785.22 standards for unpaid sleep time for employees "required to be on duty for 24 hours or more," as construed in the February 3, 1981 letter ruling. Appellees and the district court concede that Region V's work schedule for the Weekend LSTs was, in concept, consistent with Sec. 785.22 as clarified by this letter ruling. Nevertheless, the district court held that the Weekend LSTs did not fall within this exception because they rarely had a night where they received "at least five hours of uninterrupted sleep." However, this is not a basis for rejecting Region V's Sec. 259 defense because it misconstrues the regulation.
 
 
 42
 Section 785.22 allows unpaid sleep time for employees who "can usually enjoy an uninterrupted night's sleep." The regulation defines "uninterrupted" as meaning, "that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time." Here, the LSTs testified that their sleep time was frequently interrupted for short periods (which they usually did not record on their time cards); their time cards reflected that they typically did get at least five hours sleep in total each night. The regulation plainly states that the required five hours' sleep need not be consecutive hours. This was confirmed by the Department's letter ruling of August 20, 1985, which stated:
 
 
 43
 [I]f an employee's sleeping time is interrupted to such an extent that the employee cannot get at least five hours' sleep during the scheduled period, then all hours of the sleeping period are compensable hours of work.
 
 
 44
 The Department's view on this issue was even more clearly stated in its May 1985 WH Publication 1459, entitled "State and Local Government Employees Under the Fair Labor Standards Act":
 
 
 45
 The 5 hours of sleep need not be 5 continuous uninterrupted hours of sleep. However, if interruptions during the sleep period are so frequent as to prevent reasonable periods of sleep totalling at least 5 hours, the entire period would be considered hours worked.
 
 
 46
 In sum, Region V and the LSTs entered into Employment Agreements providing for sleep time compensation consistent with Sec. 785.22, and requiring the LSTs to record compensable sleep time on their time cards. Region V paid the LSTs for all recorded compensable sleep time. Under these circumstances, Region V's Sec. 259 defense may not be defeated by the LSTs' general testimony that their sleep time was frequently interrupted for uncertain lengths of time which they chose not to reflect on their time cards. See Davis v. Food Lion, 792 F.2d 1274, 1276-1277 (4th Cir.1986).
 
 
 47
 We note that this factor distinguishes this case from Hultgren. In Hultgren, which did not involve full-time employees such as the Weekday LSTs and the Weekend LSTs, this court rejected the employer's good faith defense, despite holding that it was entitled to rely upon the Department's letter rulings, because the district court had specifically found "that relief employees averaged from zero to four hours of sleep during the nighttime hours," 913 F.2d at 508. This essential fact made the employer's sleep time conditions obviously inconsistent with the Department's regulations and its letter rulings, and thus compelled the conclusion that the employer's Sec. 259 good faith defense must be rejected.
 
 
 48
 Substitute LSTs. These employees replaced both Weekday LSTs and Weekend LSTs when needed. Each worked the same schedule as the LST being replaced. The Employment Agreements defined the paid work day for substitute LSTs as 3:30 p.m. to 10:00 p.m. and 6:00 a.m. to 8:00 a.m. during each shift worked, with the Evening Hours again being unpaid.
 
 
 49
 The issue of when sleep time must be paid to substitute or relief houseparents in community homes was specifically addressed in two of the Deputy Administrator's letter rulings. The February 3, 1981 letter stated:
 
 
 50
 Your third and final question related to employees who do not reside at the community residences but who, as relief employees, remain there for at least 24 hours, and often as long as two or three days.... [Although] such employees ... are arguably on duty for less than 24 hours ... we believe that such sleep time can be deducted from hours worked, provided that the employer and employees agree in advance to do so, and that no more than 8 hours per night (or actual, uninterrupted sleeptime, if that is less than 8 hours) is deducted.
 
 
 51
 By letter dated August 20, 1985, the Deputy Administrator responded to a request for further clarification of the Department's position regarding houseparent sleep time:
 
 
 52
 We have reviewed all available information, including that furnished by you and that obtained from a review of a large number of case files involving investigations of community residences under FLSA. As a result of this comprehensive review, we have concluded that, because of the special circumstances that prevail in community residences, and because relief employees perform essentially the same duties as regular full-time employees, the same "hours worked" principles should be applied to both categories of employees.... Therefore, it is our opinion that, in situations where a community residence employs one or more full-time employees who reside on the employer's premises on a permanent basis or for extended periods of time, the employer and a relief employee who performs essentially the same duties as such full-time employees may agree, in advance of the performance of any work, that sleeping time of up to eight hours can be excluded from compensable hours of work, regardless of the length of the tour of duty involved.
 
 
 53
 In Hultgren, the issue was whether FLSA required the employer to compensate the sleep time of relief assistants who replaced resident managers one or two days a week at residential facilities for the mentally retarded in another county of Nebraska. However, because the resident managers were exempt, the relief employees in Hultgren were not entitled to the "departure" from the regulations explained in the above letter rulings. Here, on the other hand, Region V's full-time employees--the Weekday LSTs and the Weekend LSTs--were allowed uncompensated sleep time, and thus Region V acted consistently with the letter rulings in providing uncompensated sleep time for the Substitute LSTs on the same basis. Accordingly, Region V has established its Sec. 259 good faith defense with respect to this category of employees as well.
 
 
 54
 Gary Sexton. This former Weekend LST testified that he was never afforded a private sleeping room at the group home at which he worked, which Region V stopped using in early 1989. Although the record included photographs of the private sleeping rooms that Region V provided at each of the group homes operating at the time of trial, Region V did not rebut Sexton's testimony that he was never afforded a private room during his employment as a Weekend LST. Region V's Sec. 259 good faith defense was based upon Department letter rulings that uniformly required that LSTs be furnished private sleeping quarters. Region V knew of this requirement and failed to comply with it at the group home where Sexton worked. Therefore, as to Sexton, we affirm the district court's decision that all sleep time was compensable under FLSA, that Region V failed to prove the Sec. 259 defense, but that liquidated damages should not be awarded.
 
 IV.
 
 55
 The Sec. 259 defense is "jurisdictional in nature." Marshall v. Baptist Hosp., supra, 668 F.2d at 239. Thus, our conclusion that Region V established the defense as to each category of LSTs ends our inquiry. Accordingly, the judgment of the district court is reversed as to all plaintiffs except Gary Sexton, as to whom it is affirmed. The award of attorneys' fees is vacated and remanded to the district court for further proceedings consistent with this decision.
 
 
 56
 LAY, Chief Judge, dissenting.
 
 
 57
 I respectfully dissent.
 
 
 58
 The reversal of the judgment of the district court constitutes a gross injustice to a dedicated working class of people. The majority opinion fails (1) to give due deference to the district court's factual findings; (2) to adhere to a controlling precedent of this circuit, Hultgren v. County of Lancaster, Neb., 913 F.2d 498 (8th Cir.1990);[1] and (3) to give proper weight to a record that is virtually undisputed.
 
 DISCUSSION
 
 59
 The fundamental issue, as posed by the majority opinion, is whether Region V is entitled to a good faith defense, under 29 U.S.C. Sec. 259 (1988),[2] for violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Sec. 201 (1988). The district court's findings that Region V failed to properly provide compensation for "sleep time" for all three classes of Life Skills Trainers ("LSTs") is unassailable. Under the clearly erroneous rule, these findings cannot be set aside. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 60
 The majority side-steps Region V's gross violations of FLSA by holding that Region V's acts or omissions were nevertheless taken in good faith because of their attempted conformity with and reliance on written administrative interpretations by a designated agency.[3] The good faith defense to liability for FLSA violations requires that Region V prove that the act or omission was "(1) taken in good faith and was (2) in conformity with and (3) in reliance on a written administrative interpretation by a designated agency." Cole v. Farm Fresh Poultry, Inc., 824 F.2d 923, 926 (11th Cir.1987); see also 29 U.S.C. Sec. 259(a) (1988). Whether Region V is entitled to the good faith defense embodied in section 259 is a question of law that is reviewed de novo. Cole, 824 F.2d at 926. The record here clearly establishes that Region V's actions did not adhere or even attempt to conform to the Department of Labor's ("Department") regulations and opinion letters in good faith. " 'The "good faith" defense is not available to an employer unless the acts or omission complained of "were in conformity with" the regulation.... This is true even though the employer erroneously believes he conformed with it and in good faith relied upon it; actual conformity is necessary.' " Olson v. Superior Pontiac-GMC, Inc., 765 F.2d 1570, 1580 (11th Cir.1985) (quoting 29 C.F.R. Sec. 790.14(a) (1984)). Region V has the burden to establish that it conformed with the letters in good faith. "This is not a requirement of a showing of general good faith; the Portal Act language, 'in good faith in conformity with,' precisely links the question of good faith to an act in conformity, and if there is no conformity, general good faith in other respects cannot save the day." EEOC v. Home Ins. Co., 672 F.2d 252, 265 (2d Cir.1982).
 
 
 61
 The fundamental issue in determining if Region V violated FLSA, and identical to the issue in Hultgren, is whether "sleep time is work time." As we stated in Hultgren, this issue is a question of fact "which must be determined 'in accordance with common sense and the general concept of work or employment.' " Hultgren, 913 F.2d at 504 (quoting Central Mo. Tel. Co. v. Conwell, 170 F.2d 641, 646 (8th Cir.1948)). Our court stated that the "issue, at bottom, is whether the employee's time is spent predominantly for the benefit of the employer or the employee." Hultgren, 913 F.2d at 504 (citing Armour & Co. v. Wantock, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944)). In bypassing the district court's findings that Region V violated FLSA, the majority obviates much of the harshness and unfairness created by Region V to the employees involved. These findings, I believe, are directly relevant to the good faith conformity which the majority chooses to discuss in its single issue analysis. The district court specifically found that the "LST's employed by Region V were staying at the residences during the nighttime hours for the benefit of Region V, not for their own benefit." Mem.Op. at 9. This finding is not clearly erroneous.[4]
 
 
 62
 In the present case, the district court found "from the evidence as a whole that Region V knew or should have known that the LST's sleep-time interruptions did occur, and that they were a normal part of the job." Id. at 14. According to the district court
 
 
 63
 [t]estimony was received regarding interruptions incurred by plaintiffs working all three different shifts. To avoid cumulative and repetitive testimony the parties stipulated that the testimony of all plaintiffs who did testify shall be considered to accurately reflect the working conditions for all LST's who are plaintiffs herein and who were employed by Region V Fairbury for the time period from April 15, 1986, until the present.
 
 
 64
 Id. at 3 (citations omitted) (emphasis added).
 
 
 65
 If substantial evidence on the record exists, as in this case, this court must show great deference to the district court's findings of fact. The majority asserts that "Region V's Sec. 259 defense may not be defeated by the LSTs' general testimony that their sleep time was frequently interrupted for uncertain lengths of time which they chose not to reflect on their time cards." Maj.Op. at 1332-1333. The district court found, however, that the sleep time interruptions were not documented on the employees' time cards because "the LST's were not allowed to document any interruptions which did not last at least 5-7 minutes and could not document interruptions for which they did not have to physically be out of bed." Mem.Op. at 13; see also Tr. at 131-32, 136-37, 142, 196-97, 212-14, 278, 298, 405-07, 412-14. These facts parallel Hultgren. See Hultgren, 913 F.2d at 506. The majority distinguishes Hultgren on the ground that the district court in Hultgren expressly found that the employees had less than five hours sleep. Maj.Op. at 1332-1333. The majority overlooks the district court's identical finding here. The district court in this case found that "few LST's ever had a night where they received at least five hours of uninterrupted sleep. The demands of their job simply did not allow for such luxury." Mem.Op. at 9. Region V's employees also were discouraged from documenting overtime hours because of budget problems. Tr. at 346. Region V knew about sleep time interruptions because of the frequent complaints from employees. Tr. at 179, 387-88, 503-05, 675, 963. "[G]ood faith requires the employer to have honesty of intention and to be without knowledge of circumstances which ought to put him upon inquiry." Olson, 765 F.2d at 1580 (citing 29 C.F.R. Sec. 790.15 (1984)). The trial transcript is replete with testimony regarding the numerous and diverse nighttime interruptions the LSTs experienced. The district court found that
 
 
 66
 [a]mong the interruptions which LST's dealt with during sleep-time hours were (1) a client who hit herself and the wall during the night, (2) a client who urinated and defecated on the floor of her bedroom, (3) clients who were incontinent and soiled their beds during the night for which an LST would clean up the client and change the sheets, (4) clients who woke up during the night and wandered about the residence, (5) clients who needed assistance in using the toilet, including the removal of clothing, wiping and flushing, (6) a client who had tried to leave the residence in the past, (7) clients who woke up during the night, dressed themselves and thought it was time to go to work, (8) a client who liked to get out of bed and rearrange things, (9) clients who awoke and became afraid of the sound of wind, thunder, and sirens, (10) a client who spent some nights awake and yelling, (11) a client who had a tendency to steal from other clients at night and damage property, (12) a client who had on occasion had a bowel movement in bed and then smeared it on the wall, (13) clients who came into the room where the LST was sleeping to make sure the LST was still there, (14) clients who became physically aggressive, (15) a client with diarrhea and a prolapsed bowel, which meant the LST had to check her after each restroom visit to make sure her bowels had not fallen outside her body, and (16) a client prone to epileptic seizures.
 
 
 67
 Mem.Op. at 3; see also Tr. at 23-26, 28-29, 31-33, 35-37, 151-62, 168-69, 266-71, 274-75, 341-42, 351-58, 364-67, 396-99, 404-06, 437-53, 509-12, 534-40. These sleep time conditions are as "obviously inconsistent with the Department's regulations and its letter rulings" in this case as they were in Hultgren. See Maj.Op. at 1333 (emphasis omitted).
 
 
 68
 The record and the district court's findings clearly demonstrate that the alleged conformity to the Department's hours requirements did not exist. However, assuming, arguendo, that there was compliance with the scheduled hours the Department's directives required, the good faith defense still must fail because of two basically undisputed deficiencies in Region V's attempted conformity.
 
 
 69
 In Hultgren, we held that the employer did not conform in good faith to the agency directives because (1) the employer failed to provide the required "home-like environment" consisting of private quarters, and (2) only a unilateral agreement enforced by the employer existed.[5] Hultgren, 913 F.2d at 506.
 
 
 70
 The record in this case overwhelmingly establishes that Region V failed to provide its employees with private quarters in a home-like environment and that it required the employees to sign a unilateral non-negotiable agreement.
 
 I. Absence of Home-like Environment
 
 71
 The June 30, 1988, letter from the Department defines "private quarters" to be furnished living quarters that are separate from the clients and from any other staff members, have as a minimum the same furnishings available to the clients and enable the employee to leave his or her belongings there during on and off duty periods. Appellant's App. at 31. A "home-like environment" is defined as facilities including private quarters and also including on the same premises facilities for cooking and eating, for bathing in private, and for recreation. The amenities and quarters must be suitable for long-term residence by individuals and must be similar to those found in a typical private residence or apartment, rather than those found in institutional facilities such as barracks, dormitories, and short-term facilities for travelers. Id. at 32.
 
 
 72
 It is virtually undisputed that Region V did not provide private quarters and a home-like environment for the employees. The district court relied upon a stipulation that the testimony of all of the employees who did testify "shall be considered to accurately reflect the working conditions for all LST's who are plaintiffs." Mem.Op. at 3. The majority holds that Gary Sexton's sleep time should be compensated because he was never given a private bedroom. Patrick Bouchard also testified that he never had a private bedroom. He testified he had to sleep on a couch in the living room because of the condition of the staff bedroom in his group home. He testified that the bed was stained and smelled of urine, body odor, and leakage from a staff person who had a tracheotomy. Tr. at 337-40; see also Tr. at 369-70. The stipulation makes the testimony of Sexton and Bouchard binding as to all the employees. All the agency letters assumed that the employees had a "home-like environment" with a private bedroom. The record presents a vivid and startling contrast. There was testimony that in some cases the employees slept on couches in the living rooms, on roll away beds in the kitchen, or on the floor either because there was no private bedroom or the bed was not in a sanitary condition. Tr. at 51-52, 74, 145-48, 191-93, 261-63, 336-40, 431-33, 541-43. There is little evidence that any of the employees had private quarters where they could leave their belongings during on and off duty periods. Tr. at 44, 147-48, 261-63, 339, 432, 542. Most of the employees testified that they could not leave any of their personal belongings in the homes while they were off duty because the clients would get into them. Id.
 
 II. The Unilateral Agreement
 
 73
 Region V did not negotiate with its employees on the issue of sleep time compensation. It created its own employment agreement from a sample agreement obtained from the National Association of Private Residential Resources ("NAPRR"). The NAPRR had advised Region V that the agreement had been approved by the Department. Region V deleted portions of the sample agreement discussing the value of room and board provided to the employee by the employer. Region V's agreement stated that "since both the meals and quarters made available to EMPLOYEE are for REGION V's convenience, no value is assigned to room and board for pay purposes, and no charge is made to EMPLOYEE for them." J.App. at 47. Region V also did not include the "Employment Agreement Pay Schedule Breakdown" that was attached to the sample agreement as part of the contract. The pay schedule breakdown applies a fixed dollar value to the employee's use of the premises and it specified the number of hours excluded pursuant to the terms of the agreement. Region V did not distinguish between the employer's premises and the employees' living quarters as did the sample agreement. It also added a clause stating that all overtime had to be documented with incident reports. Region V never asked legal counsel to review the agreement regarding the sleep time exclusion. Tr. at 765-68. It only asked counsel to review the agreement for "legal problems." Tr. at 768; Jt.App. at 89-90.
 
 
 74
 Any agreement to exclude sleep time must be "mutually agreed upon."[6] Hultgren, 913 F.2d at 506. Region V did not attempt to reach a "mutually agreed-upon" decision that sleep time would be uncompensated. The 1985 opinion letter stated that the employer could not unilaterally decide to exclude sleep time from compensation. Appellant's App. at 27. Region V's employees had no input into the terms of the agreement. Tr. at 599, 772. Region V required its employees to individually sign the employment agreement to receive their paychecks. Tr. at 55-58, 135, 176-77, 418, 454-57, 543-44, 963. The majority contends there was no evidence that the employees refused to sign the agreement but it is difficult to refuse to sign under the duress of a withheld paycheck.
 
 
 75
 III. Nonconformity with Agency Regulations and Directives
 
 
 76
 In addition to nonconformity with the Department's directives regarding home-like environment and a negotiated agreement, Region V also was not in actual conformity with the regulations and directives concerning the number of hours worked before an employer can exclude sleep time.
 
 A. Weekday LSTs
 
 77
 An employer must pay an employee for sleep time unless the employee's work schedule falls under one of the exceptions contained in the regulations. Region V argues that it excluded sleep time in the good faith belief that its employees fell under the exceptions. The weekday LSTs' schedule did not comply with any of the exceptions.[7] They did not qualify for the exception under 29 C.F.R. Sec. 785.22 (1987), because they were not on duty twenty-four hours or more.[8] The weekday LSTs were off duty for several hours everyday and according to the Department's interpretations of the regulations this interruption kept the employees from qualifying for this exception. Appellant's App. at 34 (June 30, 1988 letter). The weekday LSTs also did not qualify for the "residing for extended periods of time exception," under 29 C.F.R. Sec. 785.23 (1987), because they did not work eight hours in five consecutive twenty-four hour periods.[9] Jt.App. at 73 (July 27, 1987 letter). These employees fall under 29 C.F.R. Sec. 785.21 (1987), which requires the employer to compensate them for sleep time.[10] To qualify for these exceptions not only does the employee's work schedule have to fit within the guidelines, outlined by the regulations and the Department's letters, but also the employer has to provide a home-like environment and the parties must mutually agree to exclude sleep time from compensation. As we discussed above, Region V did not provide a home-like environment for its employees and it did not mutually agree with its employees to exclude sleep time.
 
 
 78
 Region V argues that it complied with the regulations after it changed the weekday LSTs' schedule on October 1, 1988. After the change, the weekday LSTs worked eight hour shifts during five consecutive twenty-four hour periods. This change allowed the LSTs to qualify for the exception under section 785.23. However, Region V still did not comply with FLSA even after the schedule change because Region V did not provide the LSTs with a home-like environment containing private quarters, the parties did not mutually agree to exclude sleep time, and the LSTs could not obtain a reasonable night's sleep. The district court found that Region V did not qualify for the section 785.23 exception because the LSTs were on Region V's premises for Region V's benefit at all times. The court found that section 785.23
 
 
 79
 speaks of sleep time as one of the "periods of complete freedom from all duties." The LST's did not have complete freedom from their duties while they slept. They were required by Region V to remain on the premises to care for and protect the clients after clocking out at night.
 
 
 80
 Mem.Op. at 7. The court also concluded that section 785.23 had to be read in conjunction with 29 C.F.R. Sec. 785.14 (1987), defining whether waiting time is time worked under FLSA.[11] The court found that a reasonable person would have looked to section 785.14 to decide whether the LSTs' sleep time should be compensated. The court found that because the LSTs were engaged to wait within the meaning of section 785.14 and Region V knew or should have known about the sleep interruptions, Region V was precluded from using the good faith defense. Mem.Op. at 13-14. The majority argues that the district court's reliance on section 785.14 was misplaced because none of the Department's letters referred to section 785.14. However, the Department's May 1985 pamphlet discussed waiting time and stated that waiting time could be included in hours worked depending on the circumstances. Jt.App. at 79. The pamphlet further stated that an employee required to be on duty for less than twenty-four hours is working even though he or she is allowed to sleep or engage in other personal activities when not busy. Id. at 81. "The employee is engaged to wait during slack time that may occur during the duty period." Id. The pamphlet stated that an employee who resides on the premises for an extended period of time
 
 
 81
 is not considered to be working all of the time while on the employer's premises. Ordinarily, an employee who resides on the employer's premises may engage in private pursuits; has enough time for eating, sleeping, and entertaining; and has other periods of complete freedom from duties when he or she may leave the premises for personal reasons. It is, of course, difficult to determine the exact hours of work under these circumstances. Therefore, any reasonable agreement by the parties which takes into consideration all of the pertinent facts will be accepted.
 
 
 82
 Id. at 82. Even while sleeping, Region V's employees did not have complete freedom from their duties because they were required to be on the premises and available in case the clients needed them. The LSTs were engaged to wait during the night.[12] The district court's finding that Region V should look to section 785.14 is not clearly erroneous under these circumstances.[13]
 
 B. Weekend LSTs
 
 83
 Weekend LSTs qualify for the twenty-four hour duty exception under section 785.22.[14] According to the regulations, these employees should be considered relief employees, not full-time employees. The majority makes its own factual findings regarding the weekend LSTs' ability to get at least five hours of sleep. Although these employees fall within section 785.22, sleep time can only be deducted if the employee can get at least five hours of sleep during the scheduled period. The district court specifically found that the weekend LSTs rarely received five hours of sleep. Mem.Op. at 9. The majority, however, overlooks this finding and uses the time cards to find that the employees typically received at least five hours of sleep a night. The majority did not state that the district court's finding was clearly erroneous. The majority also does not address the fact that the district court found the LSTs were not allowed to document many of their sleep time interruptions. The majority distinguishes Hultgren on this point, arguing that Hultgren did not involve full-time employees. In this case, the only employees considered full-time by the regulations are the weekday LSTs. The weekend and substitute LSTs are considered relief employees. In any event, the letters also state that relief and full-time employees should be treated the same regarding sleep time deductions. See Appellant's App. at 27-28 (Aug. 20, 1985 letter). The majority attempts to distinguish Hultgren on the basis that the Hultgren district court found the employees averaged from zero to four hours of sleep a night. The majority finds that this was obviously inconsistent with the regulations. The district court in this case found that Region V's employees did not receive five hours of sleep a night. Thus, Region V's treatment of its employees also was obviously inconsistent with the regulations. In this regard the majority's analysis remains inexplicable.
 
 C. Substitute LSTs
 
 84
 Substitute LSTs worked the same shift as the person they replaced. Thus, they should also be considered relief employees.
 
 
 85
 To show compliance with the Department's requirements, Region V asserted that its employees were on call from 6:00 a.m. until 2:00 p.m. Tr. at 667-70. The employees, however, were never called in nor did they have to provide a telephone number where they could be reached. Even if an "on-call" employee was needed to work for some reason, Region V would call a substitute instead of a full-time employee. Tr. at 566-70. This was an obvious attempt to circumvent the regulations. These violations cannot be ignored when weighing the alleged good faith reliance on the agency letters upon which the majority opinion focuses.
 
 CONCLUSION
 
 86
 Each directive relied on by Region V to support its good faith defense was conditioned upon (1) the employer and the employees agreeing in advance to exclude sleep time, and (2) the employer providing a home-like environment for the employees. Region V did not meet these conditions.
 
 
 87
 I respectfully submit that this court should be bound by the record and our own precedent. I therefore dissent.
 
 
 
 [1]
 NAPRR has been the primary organization with which the Department has communicated since the early 1970's on FLSA issues concerning employees of community-based residential facilities. NAPRR filed an amicus curiae brief supporting Region V's Sec. 259 defense in this case
 
 
 [2]
 Unlike the defendant in Hultgren, Region V had not been the subject of any investigation or enforcement litigation by the Department
 
 
 [3]
 The Department's June 1988 Enforcement Policy provided that, to reside on the employer's premises for an extended period of time under Sec. 785.23, an employee must be compensated "for at least eight hours in each of five consecutive 24-hour periods." As a result of this change--described by the Department as a refinement--Region V revised its work schedule for Weekday LSTs to provide for eight compensated hours each day, Monday through Friday, and reflected this new schedule in the October 1988 Employment Agreement. We consider this aspect of the Department's Enforcement Policy an unreasonable attempt to dictate the precise nature of relationships that Skidmore and the regulation acknowledge will vary. But in any event, Region V's prior schedule was in reasonable conformity with the regulation and with the February 3, 1981 letter ruling
 
 
 [1]
 The Hultgren case is identical in fact and law to the present case. It is indistinguishable. I respectfully submit our failure to apply the controlling principles of our own precedent can only result in confusion to the Department of Labor, litigants, and the bar
 
 
 [2]
 Section 259(a) provides:
 In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.
 29 U.S.C. Sec. 259(a) (1988).
 
 
 [3]
 The majority initially premises its reversal on the district court's mistaken view that because some of the administrative letters were written by lesser officials within the agency Region V was not entitled to rely on them. This interpretation was deemed erroneous by this court in Hultgren but we nevertheless affirmed the same district court's holding that FLSA was violated and that there was no good faith conformity with the letters. This issue is not determinative here any more than it was in Hultgren. The district court analyzed all the regulations and the key administrative letters. The majority relies on all the letters in holding good faith conformity. Therefore, the basic principle upon which the majority premises its reversal--"the district court applied a legal standard subsequently rejected by this court"--is irrelevant
 
 
 [4]
 Even Region V's employment agreement states that the employees are sleeping at the residences for Region V's benefit. Jt.App. at 47
 
 
 [5]
 The court in Hultgren observed:
 Even assuming section 785.22 of the regulations applies, both this regulation and the opinion letters from the Wage & Hour Deputy Administrator are premised on the notion that employees are able to get a full night's sleep and are provided with adequate sleeping facilities or a home-like environment in a group home setting. The sleeping accommodations for plaintiffs in this case, who were generally in a different group home each night they worked and who often slept on a sofa or a hide-a-bed in the living room, are simply not the same as the environment envisioned by the opinion letters. Moreover, plaintiffs did not usually enjoy an uninterrupted night's sleep, both because of [the] nature of their sleeping accommodations and because, as a general rule, the clients who resided in [the employer's] facilities were "prone to being up at night, often frequently, and on a consistent basis over time." Thus, "the very nature of plaintiffs' jobs required that they be ready for frequent nighttime interruptions."
 Nor did plaintiffs agree that their "sleep time" could be uncompensated. The Deputy Administrator's 1985 opinion letter stresses that only "mutually agreed-upon" sleep time may be excluded: the exclusion of sleep time may not be the "unilateral decision of the employer." The magistrate in this case found [the employer's] post-Garcia [v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) ] contracts "were drafted exclusively by the defendant with no input or negotiation from the plaintiffs or even any bargaining agent for them.... The evidence is uncontradicted that the contracts at issue in this case were most certainly presented on a take-it or leave-it basis without any possibility for negotiation by the plaintiffs."
 Hultgren, 913 F.2d at 506.
 
 
 [6]
 The facts here are nearly identical to Hultgren, reflecting that it is not so easily distinguishable. As in Hultgren, the agreement here was "the unilateral decision of the employer." Hultgren, 913 F.2d at 506
 
 
 [7]
 Weekday LSTs worked Monday 3:30 p.m. to 10:00 p.m. (slept from 10:00 p.m. to 6:00 a.m. Monday through Thursday), Tuesday to Thursday 6:00 to 8:00 a.m., 3:30-10:00 p.m. (off-duty free time from 8:00 a.m. to 3:30 p.m. Monday through Thursday), and Friday 6:00 to 8:00 a.m
 
 
 [8]
 Section 785.22 provides that:
 (a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.
 (b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.
 
 
 [29]
 C.F.R. Sec. 785.22 (1987) (citations omitted)
 
 
 [9]
 Region V places the most reliance on section 785.23. This regulation states:
 An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.
 
 
 [29]
 C.F.R. Sec. 785.23 (1987) (citations omitted)
 
 
 [10]
 Section 785.21 discusses employees on duty less than twenty-four hours. It states that:
 An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A telephone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime.
 
 
 [29]
 C.F.R. Sec. 785.21 (1987) (citations omitted)
 
 
 [11]
 Section 785.14 provides:
 Whether waiting time is time worked under the Act depends upon particular circumstances. The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances. Facts may show that the employee was engaged to wait or they may show that he waited to be engaged." Such questions "must be determined in accordance with common sense and the general concept of work or employment."
 
 
 [29]
 C.F.R. Sec. 785.14 (1987) (citations omitted)
 
 
 [12]
 The pamphlet stated that employees "on call" who were not required to remain on the employer's premises and who were free to engage in personal pursuits were not working while on call. However,
 [w]hen an employee is called out on a job assignment, only the time actually spent in making the call need be counted as hours worked. Of course, if calls are so frequent or the readiness conditions are so restrictive that the employee is not really free to use the intervening periods effectively for his or her own benefit, the employee may be considered as "engaged to wait" rather than "waiting to be engaged."
 Jt.App. at 80.
 
 
 [13]
 The majority states that Region V could reasonably rely on the Department's February 3, 1981, letter discussing the sleep time issue as it applied to house parents in a group home. The majority argues that the house parents' schedule in that letter was similar to the weekday LSTs' schedule in this case. The schedule referred to in the letter indicated that employees on duty from 9:00 a.m. Monday to 5:00 p.m. Friday are considered to reside on the premises for extended periods of time within section 785.23 because they are on duty five consecutive days. The weekday LSTs in this case worked five consecutive days but did not work full days. The LSTs only worked two hours on Friday. This is far removed from conformity with the Department's letter. That letter also provided that the parties had to have a reasonable agreement regarding sleep time deductions and that the employer had to provide a home-like environment with private quarters for the employees
 
 
 [14]
 Weekend LSTs worked Friday from 3:30-10:00 p.m. (slept 10:00 p.m. to 6:00 a.m. Friday through Sunday), Saturday and Sunday 6:00 a.m. to 10:00 p.m., and Monday 6:00 to 8:00 a.m