[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-10954

_____

DAVID THOMPSON,

Plaintiff-Appellant,

*versus*

REGIONS SECURITY SERVICES, INC.,
a Florida corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-62152-WPD

_____

Before WILSON and ROSENBAUM, Circuit Judges, and CONWAY,[*] District Judge.

ROSENBAUM, Circuit Judge:

The Fair Labor Standards Act prohibits an employer from scheduling an employee "for a workweek longer than forty hours" without paying that employee overtime compensation. 29 U.S.C. § 207(a)(1). To enforce that command, the FLSA requires an employer to pay two different compensation rates: (1) an employee's regular rate, which describes the non-overtime hourly rate that he regularly earns; and (2) an employee's overtime rate, which must be at least "one-and-one-half times the regular rate at which he is employed." *Id.*

In this case, Plaintiff-Appellant David Thompson, a security guard, alleged that his employer set two different "regular rates" and that one of those rates was an artificial one that his employer designed to avoid complying with the FLSA's overtime-compensation requirement. When Thompson became a security guard for Defendant-Appellee Regional Security Services, Inc., his established regular rate was $13.00, and he typically worked a forty-hour week. But seven months after Regional Security first started scheduling Thompson to work overtime, it reduced his rate to $11.15 per hour. About a year later, Regional Security stopped scheduling

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

Thompson to work overtime hours and at the same time restored his non-overtime pay rate to $13.00 per hour.

This case requires us to decide whether Thompson's "regular rate" was $13.00 per hour or $11.15 per hour during the year or so that he worked overtime hours and earned $11.15 per hour. Thompson's allegations support his theory that Regional Security set an artificial $11.15 rate during the year that it scheduled him to work significant overtime hours so that it could avoid paying him $19.50 (one-and-a-half times his $13.00 rate) for his overtime hours. Indeed, during the year that Thompson worked significant overtime hours, his reduced $11.15 rate caused him to earn on average $13.00 per hour for all sixty hours in a sixty-hour workweek.  *See infra* n.4.  Plus, Regional Security immediately reverted to paying Thompson's $13.00 rate when it stopped scheduling him to work overtime hours.

Because these allegations plausibly support Thompson's claim that Regional Security reduced Thompson's regular rate to avoid paying him overtime compensation, we conclude that Regional Security's motion for judgment on the pleadings was required to be denied.  We therefore vacate the district court's order granting that motion and remand for further proceedings.

## I.

David Thompson worked as a security guard for Regional Security Services, Inc.[1]  He typically worked forty hours per week, and Regional Security paid him $13.00 per hour.  But in January 2019, Regional Security began scheduling Thompson for an additional twenty or so hours per week, raising his weekly total to about sixty hours.  For the next seven months, Thompson continued to earn his established hourly rate of $13.00 per hour for the first forty hours he worked in a week.  And for each hour he worked beyond that, he earned an overtime rate of $19.50 per hour (time-and-a-half).

Then, on July 22, 2019, Regional Security reduced Thompson's rate to $11.15 per hour for the first forty hours.  Correspondingly, Regional Security lowered Thompson's overtime rate to $16.73 per hour (again, time-and-a-half).  For the next eleven-some-odd months, Thompson worked between fifty-five and seventy-five hours per week.

After scheduling Thompson to work overtime and paying him a reduced rate for nearly a year, Regional Security made an

---

[1] Because we are reviewing the district court's order entering judgment on the pleadings, our description of the facts accepts the allegations in Thompson's complaint as true.  *See, e.g.*, *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (citation omitted).  The actual facts may or may not be as alleged.

abrupt turn. All at once, it cut Thompson's workweek to forty hours and restored his non-overtime hourly rate to $13.00.

Based on these facts, Thompson sued Regional Security, alleging that it reduced his hourly rate "to an artificially low rate to avoid" the FLSA's overtime provisions during the year that it paid him a non-overtime hourly rate of $11.15. In other words, Thompson asserted that Regional Security diminished his hourly rate to $11.15 from $13.00 so that it could schedule him for significant overtime hours without having to pay him $19.50 (one-and-a-half times his $13.00 hourly rate) for those overtime hours.

Regional Security moved for judgment on the pleadings, and the district court granted that motion. Thompson now appeals.

## II.

We use the *de novo* standard to review a district court's order granting judgment on the pleadings. *Perez*, 774 F.3d at 1335 (citation omitted). Granting judgment on the pleadings is appropriate when "there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Id*. (quoting *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)). When determining whether judgment on the pleadings should be granted, "we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the non-moving party." *Id*. (citation omitted).

### III.

Under the FLSA, if an employee's "workweek [is] longer than forty hours," the employer must pay that employee overtime compensation. 29 U.S.C. § 207(a)(1). And the rate at which the FLSA requires a covered employer to compensate its employee for each hour beyond forty in that employee's workweek is "not less than one-and-one-half times the regular rate at which he is employed." *Id*.

This appeal turns on the meaning of the statutory phrase "regular rate." As the Supreme Court has explained, an employee's "regular rate" is the "keystone" of the FLSA's overtime provisions. *Walling v. Youngerman-Reynolds Hardwood Co. ("Youngerman-Reynolds")*, 325 U.S. 419, 424 (1945). Because an employee's overtime rate must equal at least one-and-a-half times his regular rate, an employee's overtime rate depends on his regular rate. "The proper determination of that rate is therefore of prime importance." *Id*. Significantly, the regular rate "is not an arbitrary label chosen by the parties; it is an actual fact." *Id*.

In construing the term "regular rate," we begin with the statutory text. *Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text.").

The FLSA generally defines the "'regular rate' . . . to include all renumeration for employment paid to" the employee. 29 U.S.C. § 207(e). But the term excludes from its parameters certain sums, payments, and compensation. *See id*. As relevant here, "regular rate" excludes an employee's compensation for overtime hours

21-10954                Opinion of the Court                        7

worked. *See id.* at § 207(e)(5), (7); *see also Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 464 (1948) ("Congress intended to exclude overtime premium payments from the computation of the regular rate of pay."). As a result, "the regular rate refers to the hourly rate actually paid to the employee for the normal, non-overtime workweek for which he is employed." *Youngerman-Reynolds*, 325 U.S. at 424 (citation omitted). That is, an employee's regular rate is his total weekly non-overtime wages divided by his total weekly non-overtime hours. *See Aaron*, 334 U.S. at 461 ("Wage divided by hours equals regular rate.").

Thompson had two different non-overtime hourly rates, so we must decide which of those two rates was his "regular rate" for purposes of the FLSA during the year or so that he worked significant overtime hours. Regional Security urges that Thompson's $11.15 hourly rate—the non-overtime hourly rate that it paid him over that year—was Thompson's "regular rate" during that period. Thompson, on the other hand, contends that his regular rate was $13.00—the rate that he earned both before he started and after he finished working overtime.

The statutory definition of "regular rate," in and of itself, does not resolve this dispute. So we delve further.

Because the statute does not further define "regular," we give the term its "ordinary public meaning." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). To discern that meaning, we consult dictionaries in use when Congress enacted the FLSA in 1938. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566

(2012); *United States v. Dominguez*, 997 F.3d 1121, 1124 (11th Cir. 2021) (citation omitted).

Those dictionaries define the word "regular" to mean "[s]teady or uniform in course, practice, or occurrence." Webster's New International Dictionary 2099 (2d ed. 1934); *see also* Black's Law Dictionary 1518 (3d ed. 1933) (noting that regular "implies uniformity, continuity, consistency, and method"). A regular rate therefore refers to a rate that is "selected . . . in conformity with established or prescribed usages, rules," or principles. Webster's New International Dictionary, *supra*, at 2099; Black's Law Dictionary, *supra*, at 1518 (describing regular as "[a]ccording to rule; as opposed to that which constitutes an exception to the rule").

We do not think that definition unambiguously answers the question of whether, on these facts, Thompson's regular rate was $13.00 or $11.15.

To be sure, Thompson alleged that his "established" non-overtime hourly rate was $13.00, based on his first several months of employment with Regional Security. This argument has a certain amount of appeal. After all, right up until July 22, 2019, $13.00 was the only non-overtime hourly rate Regional Security ever paid Thompson. And as soon as Regional Security stopped scheduling Thompson to work overtime hours following the period when it paid him a non-overtime rate of $11.15, it immediately reverted to paying Thompson's $13.00 rate. In this sense, Thompson's "established or prescribed" rate might fairly be characterized as $13.00.

On the other hand, under § 207, an employer can lawfully reduce an employee's non-overtime rate in some situations. Indeed, the Supreme Court has said that "[t]he Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected." *Walling v. Helmerich & Payne*, 323 U.S. 37, 42 (1944). So "[a]s long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish [the] regular rate at any point and in any manner they see fit." *Youngerman-Reynolds*, 325 U.S. at 424. The sole limitation on "this freedom of contract" is that it "does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes" of the FLSA. *Helmerich & Payne*, 323 U.S. at 42.

In *Parth v. Pomona Valley Hospital Medical Center*, 630 F.3d 794 (9th Cir. 2010), for instance, the Ninth Circuit, relying in part on *Youngerman-Reynolds*, held that an "employer may reduce" its employees' regular rates to accommodate their scheduling desires "so long as the rate reduction was not designed to circumvent the provisions (including overtime) of the [FLSA]." *Id*. at 797.

Here, Regional Security paid Thompson $11.15 for nearly a year, and Regional Security's answer to Thompson's complaint alleges that it did so to accommodate Thompson's "requested scheduling modifications." Still, though, we must view the pleadings in the light most favorable to Thompson, and in doing that, we can't tell based on the pleadings alone whether the parties permissibly

contracted for the $11.15 rate. So we can't say that the statutory language unambiguously answers the question of whether Thompson's "regular rate" was $13.00 or $11.15.

On top of that, the Supreme Court has acknowledged the ambiguous nature of the term "regular rate." More generally, in *Bay Ridge Operating Co. v. Aaron*, the Court explained that in the FLSA, "Congress necessarily had to rely upon judicial or administrative application of its standards in applying sanctions to individual situations. These standards had to be expressed in words of generality." 334 U.S. at 461–62. And as for the phrase "regular rate" in particular, the Supreme Court characterized *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942), as having "refrained from rigidly defining 'regular rate' in a guaranteed weekly wage contract that met the statutory requirements of § 7(a) for minimum compensation." *Aaron*, 334 U.S. at 462 (citing *A.H. Belo Corp.*, 316 U.S. at 634).

In sum, then, the statutory language is inconclusive about whether $11.15 or $13.00 is "the regular rate at which [Thompson] is employed." Perhaps for that reason, the parties' dispute centers on the Department of Labor's (the "Department") interpretations of the FLSA's overtime provisions. Those interpretations reside in Part 778 of Title 29 of the Code of Federal Regulations. *See* 29 C.F.R. § 778.1.

Before we dive into that part of the Code of Federal Regulations, though, we pause to consider the weight that we accord to the interpretations in Part 788. To determine the answer to that question, we begin with Part 788's origins. Before the Department

promulgated Part 788, the agency's interpretations of the FLSA's overtime requirements appeared "in an interpretative bulletin and in informal rulings." *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944). Faced with a question involving one of these interpretive bulletins, the Supreme Court acknowledged that the Department's informal interpretations are "not controlling upon the courts by reason of their authority," *id.* at 140; *see also Overnight Motor Transp. Co. v. Misel*, 316 U.S. 572, 580 n.17 (1942), *superseded by statute*, Port-to-Portal Pay Act of 1947, 61 Stat. 84, *as recognized in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 n.29 (1985); *Foremost Dairies, Inc. v. Wirtz*, 381 F.2d 653, 659 (5th Cir. 1967) ("We are, of course, not bound by interpretative bulletins or administrative opinions.").[2]

The Department replaced those interpretive bulletins with Part 788, which it published to the Code of Federal Regulations "to make available in one place the" agency's interpretations of the FLSA's overtime requirements. *See* Overtime Compensation, *33* Fed. Reg. 986, 987–88 (Jan. 26, 1968) (codified as amended at 29 C.F.R. pt. 788). In so doing, the Department invoked the Administrative Procedure Act's exception for interpretive rules to the

---

[2] The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

notice-and-comment requirements.[3]  33 Fed. Reg. at 986; *see also* 5 U.S.C. § 553(b)(A) (excepting "interpretative rules" from notice and comment).  Still, we continued to acknowledge that the bulletins in Part 788 "provide us with guidance simply because they reflect the position of those most experienced with the application of the

---

[3] When an agency promulgates an interpretation of an ambiguous statute using notice-and-comment procedures, the resulting interpretation is generally entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), meaning it receives "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844. *See, e.g.*, *U.S. v. Mead Corp.*, 533 U.S. 218, 230–31 (2001) (describing "notice-and-comment" procedures "as significant . . . in pointing to *Chevron* authority"). On the other hand, an agency interpretation that was not promulgated through notice-and-comment procedures generally does not receive *Chevron*-style deference. *See, e.g.*, *Miccosukee Tribe of Indians v. U.S.*, 566 F.3d 1257, 1272–73 (11th Cir. 2009) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)). Instead, interpretations promulgated through less formal procedures—as Part 778 was—generally receive *Skidmore* deference. *Rodriquez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268 n.5 (11th Cir. 2008). In contrast to *Chevron* deference, *Skidmore* deference is deference to an agency's interpretation that corresponds to "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. The level of deference that may apply—*Chevron* or *Skidmore*—is not always apparent. *See, e.g.*, *Durr v. Shinseki*, 638 F.3d 1342, 1348 (11th Cir. 2011) (noting that we have "applied *Chevron* level deference to an agency handbook when Congress has authorized an agency to 'issue regulations that have the force of law' and the agency's handbook has been subject to notice-and-comment rulemaking," but deciding not to determine whether *Chevron* or *Skidmore* deference applies to certain regulations in VA Handbook 5021/6 (citation omitted)).

21-10954                Opinion of the Court                13

[FLSA]." *Brennan v. Great Am. Disc. & Credit Co.*, 477 F.2d 292, 296–97 (5th Cir. 1973) (citing *Wirtz*, 381 F.2d at 659).

In sum, then, we have consistently accorded *Skidmore* deference to the interpretative bulletins that now reside in Part 778. *See Wirtz*, 381 F.2d at 659 (citing *Skidmore*, 323 U.S. at 140). So we will do so here as well. That means we will accord Part 788 "deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012)); *see also Skidmore*, 323 U.S. at 140.

In his complaint, Thompson cites 29 C.F.R. § 778.500 to support his claim that his regular rate was $13.00 per hour during the year or so that he worked significant overtime. Under that rule, an employee's regular rate cannot "vary from week to week inversely with the length of the workweek." *Id*. § 778.500(b). Citing this rule, the Ninth Circuit has observed that an "agreement, practice, or device that lowers the hourly rate during statutory overtime hours or weeks when statutory overtime is worked is expressly prohibited under" the Department's interpretive regulations. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 997 (9th Cir. 2017); *see also* Les A. Schneider & Larry J. Stine, *Wage and Hour Law: Compliance and Practice* § 9:1 (2023) ("The FLSA regulations expressly prohibit any agreement, practice, or device that provides for a lower hourly rate to be paid during . . . weeks when overtime is worked.").

That prohibition on lowering an employee's regular rate and increasing the hours in his workweek prevents an employer from circumventing the FLSA's overtime requirements. As 29 C.F.R. § 778.327 demonstrates, this non-circumvention rule prevents an employer from playing with an employee's hours and rates to effectively avoid paying time-and-a-half for an employee's overtime hours. Otherwise, an employer could use "simple arithmetic" to lower an employee's rate and increase his hours so that he could never earn time-and-a-half pay—"no matter how many hours he worked." *Id*. § 778.327(a).

Consider an example: our hypothetical employee has earned a $7 non-overtime hourly rate while working forty-hour workweeks for ten weeks. At the start of week eleven, our hypothetical employer reduces the employee's non-overtime hourly rate to $6 and schedules him to work sixty hours that week. If we treat that new non-overtime hourly rate as the employee's regular rate for his sixty-hour workweek, the employee will gross $420 for that sixty-hour workweek. (The employee's $6 non-overtime hourly rate times forty hours equals $240. The employee's overtime rate of $9 (time-and-a-half, based on a $6 non-overtime hourly rate) times twenty hours equals $180. The sum of $180 and $240 is $420.) But the employee would have earned the same amount if the employer simply paid him $7 per hour—the established non-overtime hourly rate he earned during his first ten non-overtime workweeks—for all sixty hours of work ($7 times sixty hours equals $420). So by reducing the employee's non-overtime hourly rate to $6 at the start of week eleven, the employer effectively

escapes its obligation to pay the employee overtime compensation. That kind of arithmetic "is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with law." *Id*. And this an employer cannot do. Rather, the employee's regular rate of pay "for overtime purposes is, obviously, the rate that he earns in the normal non[-]overtime week—in this case, $[7] per hour." *Id*.

We find that this interpretation has the "power to persuade," *Skidmore*, 323 U.S. at 140, because it preserves what the Supreme Court has said is "the Congressional purpose" behind the FLSA's overtime provisions. *Helmerich & Payne*, 323 U.S. at 40. As the Court has explained, Congress enacted the FLSA's overtime provisions "to spread employment by placing financial pressure on the employer through the overtime pay requirement" and "to compensate employees for the burden of a workweek in excess of the hours fixed in the Act." *Id*. (citation omitted).

The Department's interpretation of the regular rate serves that purpose by prohibiting an employer from using "simple arithmetic" to ensure that an employee earns no more than his non-overtime hourly rate—"no matter how many hours he work[s]." 29 C.F.R. § 778.327(a). Without that prohibition, the FLSA would neither (1) place "financial pressure" on employers to hire additional workers instead of scheduling their existing employees to work overtime, nor (2) ensure that employees receive additional compensation "for the burden of a workweek in excess of the hours fixed in the Act." *Helmerich & Payne*, 323 U.S. at 40 (citation

omitted). In sum, then, 29 C.F.R. § 778.327 interprets the term "regular rate" in a way that prevents employers from nullifying the FLSA's overtime provisions. For that reason, we find that the regulation persuasively interprets the term.

Applying that interpretation to the allegations in Thompson's complaint and viewing those allegations in the light most favorable to him, we conclude that Thompson plausibly alleged that Regional Security used prohibited arithmetic here. Thompson initially earned a $13.00 non-overtime hourly rate and worked a forty-hour workweek. But soon after Regional Security started scheduling Thompson for sixty-hour workweeks, it slashed his non-overtime hourly rate to $11.15. Under this new non-overtime hourly rate, Thompson would gross $780.50 for a sixty-hour workweek—which is only $.50 more than he would have earned if he were paid his former $13.00 non-overtime hourly rate for all sixty hours of work.[4] This arithmetic, together with Thompson's allegations that Regional Security paid him $13.00 per hour as a regular rate during his initial tenure with the company and during the workweeks after it stopped scheduling him for overtime, supports the reasonable inference that Regional Security slashed Thompson's non-overtime hourly rate to avoid paying him an overtime rate equal to one-and-a-half times his established $13.00 rate.

---

[4] Thompson's weekly average rate of $11.15 multiplied by forty hours equals $446. His overtime hourly rate of $16.725—that is, one-and-a-half times $11.15—multiplied by twenty overtime hours equals $334.50. The sum of $446 and $334.50 is $780.50.

Of course, it's also possible that Regional Security reduced Thompson's weekly average rate for a different and permissible reason. As we've noted, employers like Regional Security can lawfully reduce an employee's weekly average rate, as long as they do not do so as a work-around of the FLSA's overtime-pay requirements. *Youngerman-Reynolds*, 325 U.S. at 424; *see also* Schneider & Stine, *supra*, § 9:7 (observing that an employer's right to reduce an employee's regular rate does not enable an employer "to manipulate the regular rate so as to prevent overtime pay").

The difference between a permissible reduction in an employee's non-overtime hourly rate and an impermissible one comes down to whether the rate change "is justified by no factor other than the number of hours" an employee worked. 29 C.F.R. § 778.327(b); *see also Parth*, 630 F.3d at 797 (holding that an employer "may reduce" an employee's weekly average rate "so long as the rate reduction was not designed to circumvent" the FLSA's overtime provisions). When a reduction in an employee's non-overtime hourly rate is justified by the length of his workweek, "the device is evasive and the rate actually paid in the shorter or non[-]overtime week is his regular rate for overtime purposes in all weeks." 29 C.F.R. § 778.327(b).

As we've indicated, Thompson's allegations suggest that Regional Security fluctuated his non-overtime hourly rate as a device to evade paying him overtime. In particular, he alleged that Regional Security "reduced" his "established" non-overtime hourly rate "to an artificially low rate to avoid the overtime provisions of

the FLSA." He also alleged that Regional Security increased the length of his workweek and reduced his non-overtime hourly rate from $13.00 to $11.15 to avoid those provisions. During the year that Regional Security paid Thompson a reduced non-overtime hourly rate and scheduled him to work sixty-hour workweeks, Thompson averred, his non-overtime hourly rate across all sixty hours of work was $13.00. *See supra* n.4. And Thompson asserted that once Regional Security ceased scheduling him to work over-time hours, it restored his non-overtime hourly rate to $13.00. Taken as true, these allegations suggest that Regional Security fluc-tuated Thompson's non-overtime hourly rate for the purpose of ensuring that he would always earn $13 per hour—"no matter how many hours he worked." 29 C.F.R. § 778.327(a).

In urging us to reach the opposite conclusion, Regional Se-curity distinguishes the "agreement, practice, or device that pro-vides for a lower hourly rate to be paid during . . . weeks when overtime is worked," as the regulation prohibits, reasoning that Thompson failed to allege that his non-overtime hourly rate "fluc-tuated from week to week depending upon whether or not he worked overtime hours." And in a sense, Regional Security is right: Thompson alleged that Regional Security paid him a $13.00 non-overtime hourly rate and worked overtime hours at time-and-a-half based on that rate for seven months before Regional Security reduced his non-overtime hourly rate.

The seven-month period between when Regional Security first scheduled Thompson to work overtime and when it reduced

his non-overtime hourly rate could support competing inferences. For instance, it could suggest that Regional Security changed Thompson's non-overtime rate after seven months because of legitimate "factor[s] other than the number of hours" in his workweek. *Id*. § 778.327(b). But it could alternatively suggest that Regional Security tried to camouflage the fact that it was attempting to circumvent the FLSA when it began effectively paying Thompson roughly $13.00 for every hour—regular and overtime—that he worked during the year or so that followed that seven-month period.

At this stage, though, we "must accept the facts alleged in the complaint as true and view them in the light most favorable to" Thompson. *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022) (quoting *Cannon*, 250 F.3d at 1301); *see also Newman v. Advanced Tech. Innovation Corp.*, 749 F.3d 33, 37 (1st Cir. 2014) (explaining that "the regular . . . rate . . . is a fact question" (citing *Aaron*, 334 U.S. at 461)). And when we do that, we must conclude that the district court erred in granting judgment on the pleadings. Even though Thompson alleged that Regional Security reduced his non-overtime hourly rate and scheduled him to work overtime in two successive steps, he also alleged that Regional Security simultaneously restored his non-overtime hourly rate and ceased scheduling him to work overtime. And during the year or so that Thompson worked overtime hours at a reduced non-overtime hourly rate, his average hourly rate for all those hours, including the overtime hours, was the same as his non-overtime hourly rate before the reduction. Those facts plausibly suggest that Regional Security used

the fluctuation in Thompson's weekly average rate as a device to avoid paying overtime compensation at one-and-a-half times the non-overtime hourly rate that Thompson earned during the weeks he did not work overtime hours.

## IV.

Because Thompson's allegations plausibly suggest that Regional Security used the fluctuation in his weekly average rate as a device to avoid paying him overtime, we vacate the district court's order granting Regional Security's motion for judgment on the pleadings and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**.