[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13669

_____

MARIA EUGENIA BLANCO,

                                        Plaintiff-Appellant,

*versus*

ANAND ADRIAN SAMUEL,
LINDSEY ADAMS FINCH,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cv-24023-RNS

_____

Before JORDAN, ROSENBAUM, and HULL, Circuit Judges.

ROSENBAUM, Circuit Judge:

Say the word "nanny," and any number of beloved fictional characters may pop into mind: Julie Andrews's Mary Poppins, Martin Lawrence's Big Momma, Fran Drescher's Nanny Fine, Robin Williams's Mrs. Doubtfire, or Vin Diesel's Shane Wolfe, to name just a few. But except for perhaps labor-law lovers, most people probably have never thought about whether any of these nannies would have been entitled to overtime pay in the real world. After all, none of these fictional nannies ever had a story line involving overtime pay.

In the real world, though, whether a nanny is entitled to overtime pay presents an important question for both nannies and their employers. The Fair Labor Standards Act ("FLSA") governs the answer to this question. As it turns out, generally, employers must pay overtime to nannies who work fewer than 120 hours per week and "reside" off the premises where they work. This case requires us to construe what it means for a nanny to "reside" at her the house where she works.

Plaintiff Maria Blanco spent roughly three years working as a nanny and housekeeper for Defendants Anand Samuel and Dr. Lindsey Finch (together, the "Parents"). For much of that time, Blanco worked 79 hours each week, beginning with one 23-hour shift and followed by four 14-hour overnight shifts. At the end of each shift, Blanco left the Parents' house until her next shift began.

The Parents paid Blanco for all 79 hours she worked each week. But Blanco believes she is also entitled to overtime compensation for 39 hours of the 79 hours each week and filed this action to collect the extra wages. The Parents dispute Blanco's claim for overtime pay because, in their view, she falls under a provision of the FLSA that exempts "any employee who is employed in domestic service in a household and who resides in such household" from receiving overtime compensation. 29 U.S.C. § 213(b)(21). The district court agreed with the Parents that Blanco "reside[d]" in their house, entered summary judgment in the Parents' favor, and denied Blanco's motion for summary judgment.

We see things differently. Based on the ordinary meaning of the term "resides," we conclude that Blanco did not "reside[]" in the Parents' house. Blanco was a night-shift worker who treated the Parents' house as her place of employment. She maintained a separate abode, she was on duty for the entirety of her 79 hours each week, and two or three other nannies worked the hours when Blanco didn't. In short, based on these and other facts we discuss later, Blanco's actions and duties show that the Parents' house was not her residence. For these reasons, we cannot properly categorize Blanco as a live-in domestic service employee, and she is entitled to overtime compensation for the hours she worked each week in excess of 40.

Separately, the Parents contend that they individually were not Blanco's employer, so they weren't responsible for paying her overtime wages. Because we don't make credibility determinations

at this stage, no matter our view of the evidence, we must agree with the district court that a genuine dispute of material fact exists. So we remand for a trial on this question.

After careful review of the record, and with the benefit of oral argument, we affirm in part and vacate in part the district court's order and remand for further proceedings.

## I.    **Background**

Blanco filed a motion for summary judgment under Federal Rule of Civil Procedure 56(a). When reviewing a grant of summary judgment under Rule 56(a), we view the record in the light most favorable to the nonmoving party and make all factual inferences in that party's favor. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).

The Parents did not separately move for summary judgment. Instead, in their reply to Blanco's motion, they urged the district court to *sua sponte* grant summary judgment in their favor, as Federal Rule of Civil Procedure 56(f)(1) permits. For summary judgment under that rule, we view the record in the light most favorable to the nonprevailing party in the district court (here, Blanco).[1]

---

[1] Under Rule 56(f)(1), after giving the moving party "notice and a reasonable time to respond, the court may . . . grant summary judgment for a non-movant." Fed. R. Civ. P. 56(f)(1). Although Blanco was the initial moving party and the Parents urged the court to grant summary judgment to them as "nonmovant[s]," the Rule 56(f)(1) summary-judgment standard is effectively

Blanco appeals both the district court's Rule 56(f)(1) grant of summary judgment in favor of the Parents and the district court's denial of her Rule 56(a) motion for summary judgment. In reviewing the district court's denial of Blanco's summary-judgment motion, we conclude that Blanco established that she did not "reside" at the Parents' house, so she was entitled to summary judgment on her Rule 56(a) motion as to the overtime-pay issue. For that reason, we review the facts in the light most favorable to the Parents as the nonmoving party and draw all factual inferences in the Parents' favor.

### A. Factual Background

#### 1. Blanco's Tenure

Maria Blanco began working as a nanny and housekeeper for the Parents in 2018. During the time the Parents employed her, the Parents had four daughters, all of whom Blanco looked after when she was on duty.[2] But Blanco wasn't the only nanny who worked for the Parents. Rather, at all times, Blanco was one of several nannies who split the hours of the children's care, so when Blanco was on duty, she worked by herself.

When Blanco started working for the Parents in 2018, she worked one shift per week. That shift ran during the day on

_____

the same as the one for Rule 56(a). For clarity, in the Rule 56(f)(1) context here, we use the term "nonprevailing party" rather than "nonmoving party."

[2] The Parents' children were born in 2014, 2015, 2017, and 2018. The Parents now have five children.

Sundays from 10:00 a.m. to 7:00 p.m.  In January 2019, after the unexpected death of a different nanny, Blanco began covering the late nanny's shifts, which largely consisted of overnight work.  Under her new schedule, Blanco worked 79 hours each week.  She began with a 23-hour shift from Sunday at 10:00 a.m. to Monday at 9:00 a.m.  Blanco's other hours came through four 14-hour shifts on consecutive days from Monday through Thursday, from 7:00 p.m. to 9:00 a.m. the following morning.  Blanco, in other words, finished her work week on Friday mornings at 9:00 a.m.

At the end of each of her five shifts during each week, Blanco almost always left the Parents' house, and a different nanny took over the childcare duties.  The Parents told Blanco that she was welcome to stay on the premises after her shifts, which she did on occasion.  And sometimes, Blanco would invite friends over to the Parents' house.  Blanco earned $800–$880 per week.[3]

While Blanco worked for the Parents, the Parents briefly lived in a condominium but later moved into a 3-bedroom, 2-bathroom house.  In that house, the Parents slept in the master bedroom, while two of their daughters slept in each of the other two bedrooms.  During her shifts, Blanco stayed in the room with the two youngest girls.

Blanco's responsibilities included housekeeping and cleaning, doing the family's laundry, tending to the children and putting

---

[3] The record is inconsistent as to whether Blanco earned $800 per week, $880 per week, or some amount in between.

them to bed, feeding the babies at night, changing diapers, remaining alert to the children and addressing any issues they had overnight, and waking the children up each morning. According to Blanco's deposition testimony, the children woke up often overnight, and that kept Blanco awake for much of the night. Still, Blanco acknowledges that she slept for some periods during the night. And before Blanco rested, she said, she spent the late-night hours studying English on Duolingo while the girls slept.

For their part, the Parents testified in their depositions that Blanco slept every night. They knew that, they explained, because they could hear her snoring from outside the door when they passed by the bedroom. And Blanco was a heavy sleeper. On two or three occasions, after returning home late and finding himself locked out of the house, Samuel had to bang on Blanco's bedroom window to ask her to let him in because Blanco did not respond when Samuel rang the doorbell or called her on the phone.

When Blanco arrived for her shifts, she brought a change of clothes and an overnight bag. She usually showered at the Parents' house after the children went to sleep. The room in which Blanco stayed with the girls was not big. So Blanco had only a small bed and a nightstand with a lamp, alarm clock, and Amazon Echo there. According to the Parents, Blanco kept a few clothes and books in the nightstand. Blanco and the girls' father Samuel were both Catholic, and in the house, Blanco placed some religious symbols, such as an open Bible in the living room, a rosary in one bedroom, and an angel in another.

Importantly, when Blanco was not working, she lived with her aunt at an apartment in North Miami. Although no written lease memorialized that arrangement, Blanco testified that she paid rent in cash to her aunt every month. After her shift ended at the Parents' home, Blanco usually returned to the apartment and slept from around 10:00 or 10:30 a.m. until 3:30 or 4:00 p.m. She did not have a key to the Parents' house, and she seldom stayed at the house beyond her shifts. Still, though, the Parents always left the house unlocked.

Blanco stopped working for the parents in August 2021. That happened, Blanco testified, because the Parents told her that, after the birth of their fifth child, they reassessed their childcare needs and no longer required her services. But according to Dr. Finch (the mother), Blanco's release stemmed from her abandonment of the job. Grace Trask, another nanny, fired Blanco.

### 2. Nanny Employment Structure

As we've mentioned, along with Blanco, several other nannies worked in the Parents' house during the relevant period. These other nannies were Isabella Toribio, Adrianna Gomez, Shane Tompkins, and Grace Trask. For most of that period, the Parents employed the nannies through one of two LLCs, each of which one of the nannies operated. The first entity was called Nannies with Love, LLC, and Toribio ran that operation. At some point, Nannies with Love exited the picture, and the second entity, Amazing Gracie, LLC, took over. Trask managed Amazing Gracie.

Although the parties dispute many facts surrounding the formation and structure of these entities, they do agree on some points.  As relevant here, the Parents were each LLC's only client, the Parents paid the LLCs the exact amounts that corresponded with the nannies' collective compensation, and the LLCs themselves made no profits.

Still, the parties disagree about some things.  For example, Blanco alleges that the Parents directed Toribio and Trask to open and operate the LLCs, while the Parents deny all involvement in the formation of the LLCs.

Even more fundamentally, Blanco contends that the Parents controlled all aspects of her employment, including hiring and firing, scheduling, compensation, and responsibilities inside the house.  Meanwhile, the Parents deny any involvement with the nannies' employment in their house.  They claim they "outsourced all aspects of the nanny operation" to the LLCs, "including scheduling, payroll[,] and regulatory compliance."  The Parents assert that they did not hire the nannies, did not control the nannies, and were not involved in setting any nanny's schedule, compensation, or responsibilities.  Rather, the Parents insist, they told the LLCs only which hours they needed childcare coverage and paid the LLCs a weekly lump sum, while the LLCs filled in all the remaining details.  Indeed, the Parents claimed, they "had no operational control over, and knew little about" the LLCs.  In short, the Parents reject the notion that they knew anything about the nannies who

worked in their household and cared for their children twenty-four hours a day, seven days a week.

That said, the Parents do acknowledge that, during an eight-week period in late 2018 through early 2019 after the Parents had an "acrimonious" separation with Toribio and Nannies with Love, the Parents were involved in the employment of the nannies "until another nanny agency was established." This arrangement lasted until the Parents hired Trask and her new entity, Amazing Gracie, to serve as replacements.

During the eight-week period in which no LLC was involved—the alleged "lone exception" to the Parents' general policy of minimizing their personal involvement with their children's care—Dr. Finch paid the remaining nannies (including Blanco) directly by personal check. She also served as their supervisor. According to the Parents, after the Parents' separation with Nannies with Love, that LLC's remaining nannies stopped working for it and instead "elected to continue to provide nanny services" for the Parents' children. Amazing Gracie then hired each of the other nannies and became their employer.

### B.  Procedural History

Blanco filed a complaint in state court seeking payment of overtime wages under the FLSA. According to Blanco, she is entitled to $28,891.59 in overtime pay. So including the FLSA's

liquidated-damages multiplier,[4] Blanco seeks a total of $57,783.18, plus attorneys' fees.

The Parents removed Blanco's suit to federal court. Primarily, they argued that she is statutorily exempt from receiving overtime pay under 29 U.S.C. § 213(b)(21), which excludes "any employee who is employed in domestic service in a household and who resides in such household."[5]

After discovery, Blanco moved for summary judgment. She contended that the FLSA makes her a protected employee, does not exempt her from overtime pay, and entitles her to liquidated damages.

The Parents opposed the motion. In their view, Blanco was statutorily exempt from overtime pay, and "substantial evidence" showed that the Parents were not Blanco's employer. The Parents also urged the district court to grant summary judgment in their favor under Federal Rule of Civil Procedure 56(f)(1).

The district court first denied Blanco's motion for summary judgment. It concluded that Blanco was not entitled to overtime

---

[4] Under 29 U.S.C. § 216(b), an employee bringing an FLSA action to collect overtime pay may recover the amount of that pay plus the same amount in liquidated damages. In other words, if she is entitled to overtime pay, Blanco may recover twice the amount she is owed.

[5] The Parents initially raised a few other defenses. They asserted that Blanco improperly seeks payment for sleep and meal time, some *de minimis* time, and some time that the statute of limitations bars. But the Parents did not develop these defenses in the district court, so we do not discuss them further.

pay because the record evidence suggested that she was exempt from overtime pay under section 213(b)(21). As the district court saw things, under the Department of Labor's ("Department") regulations, Blanco "reside[d]" in the Parents' house, so she was exempt from overtime pay. The district court also found that a genuine dispute of material fact existed over whether the Parents were Blanco's employer.

Besides reaching these conclusions, the district court gave notice that it would consider applying Rule 56(f) to support summary judgment in the Parents' favor. Then, it scheduled a hearing to allow Blanco to present arguments.

After the hearing, the district court granted summary judgment for the Parents. It reiterated its conclusion that Blanco was exempt from overtime pay under section 213(b)(21) and that Blanco did not create a genuine dispute of material fact on the applicability of the exemption. Citing record evidence that Blanco slept during her shifts, the court determined that the evidence supported summary judgment.

Blanco timely appealed.[6]

## II.    Standard of Review

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment

---

[6] While this appeal was pending, the district court awarded $6,741.58 in costs to the Parents.

as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). As to Blanco's Rule 56(a) motion, we review a district court's grant of summary judgment de novo, construing all evidence in the light most favorable to the nonmoving party, the Parents. *See Harrison v. Culliver*, 746 F.3d 1288, 1297 (11th Cir. 2014). When factual conflicts arise, we "must credit the nonmoving party's version." *Feliciano*, 707 F.3d at 1252 (alteration adopted) (citation omitted). But summary judgment may be proper when the question before the district court is purely a question of law. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

On the other hand, even if a court "believes the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). Indeed, the court cannot discount a party's testimony on summary judgment "unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano*, 707 F.3d at 1253. And we've recognized that a nonmoving party can create a genuine dispute of material fact even if its evidence "consists primarily or solely of [its] own self-serving sworn statements or testimony." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' so they are not appropriate determinations to make at the

summary judgment stage." *Butler v. Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### III.    Discussion

Our discussion proceeds in two parts.  We first consider whether the FLSA's exemption for live-in domestic service employees excludes Blanco from overtime-payment eligibility.  Second, we assess whether the Parents have raised a genuine dispute of material fact as to whether they were Blanco's employer.

### A.  Blanco is not exempt from overtime pay.

#### 1. Under the FLSA, Blanco did not reside at the Parents' house.

The FLSA entitles many workers to overtime compensation—time-and-a-half pay—for each hour of work exceeding forty hours per week.  29 U.S.C. § 207(a); *see Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1305 (11th Cir. 2023).  Congress designed the overtime provision "both to 'compensate employees for the burden' of working extra-long hours and to increase overall employment by incentivizing employers to widen their 'distribution of available work.'"  *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 44 (2023) (alteration adopted) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577 (1942)).

But not all workers are eligible for overtime compensation. The FLSA "exempts certain categories of workers from its protections, including the overtime-pay guarantee."  *Id.*; 29 U.S.C. § 213(b).  The exemption at issue here excludes "any employee who

is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21). We will call this provision the live-in service exemption.

Congress enacted the live-in service exemption in 1974 when it amended the FLSA "to include many 'domestic service' employees not previously subject to its minimum wage and maximum hour requirements." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 162 (2007); Fair Labor Standards Amendments of 1974, Pub. L. 93-259, § 7, 88 Stat. 55, 62 (1974). Though the amendments broadened FLSA's coverage of domestic service workers, they exempted certain workers from coverage, including through the live-in service exemption. *Long Island Care*, 551 U.S. at 162.

For the live-in service exemption to apply, the employee must (1) work in domestic service, (2) work in a household, and (3) reside in that household. *See* 29 U.S.C. § 213(b)(21). The parties agree that Blanco meets the first two requirements. But they dispute whether she "reside[d]" in the Parents' household. So we must interpret the statute and apply it to the undisputed facts in the record to determine whether Blanco "reside[d]" with the Parents, as the FLSA contemplates that term.

The Supreme Court has provided instructions for how we should interpret the FLSA's exemptions. In the past, courts had construed the exemptions narrowly against the employers asserting them. *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). But we no longer do so after the Supreme Court's decision in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). In *Encino*

*Motorcars*, the Court explained that "the FLSA gives no 'textual indication' that its exemptions should be construed narrowly," so "there is no reason to give them anything other than a fair (rather than a 'narrow') interpretation." *Id.* (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts 363* (2012)). After all, the Supreme Court reasoned, the exemptions in section 213(b) "are as much a part of the FLSA's purpose as the overtime-pay requirement." *Id.*[7]

To construe the live-in service exemption, we begin (as we always do) with the statutory text. *See Thompson*, 67 F.4th at 1305. The FLSA does not define "resides." Nor have the Supreme Court or we construed the FLSA's use of that term. So to determine the meaning of "resides," we turn to its "plain meaning at the time of enactment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020). Based on contemporaneous dictionary definitions, to "reside" means "to dwell permanently or continuously; have a settled abode for a time; have one's residence or domicile." *Reside, Webster's Third New Int'l Dictionary, Unabridged* 1971 (1971);[8] *see also United States v. Sabhnani,*

---

[7] Nevertheless, the employer generally bears the burden of proving that an exemption applies. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974); *Fowler v. OSP Prevention Group, Inc.*, 38 F.4th 103, 105 (11th Cir. 2022).

[8] This definition parallels others from around 1974, when Congress enacted the language. *See e.g.*, *Reside, Black's Law Dictionary* 1473 (4th ed. rev. 1968) ("Live, dwell, abide, sojourn, stay, remain, lodge."); *Reside, Webster's New World Dictionary* 1209 (2d college ed. 1972) ("To dwell for a long time; have one's residence; live."); *Reside, Shorter Oxford English Dictionary* 1806 (3d ed. 1973) ("To dwell permanently or for a considerable time, to have one's settled or usual abode, to live, in or at a particular place.").

22-13669                Opinion of the Court                17

599 F.3d 215, 256 (2d Cir. 2010) (adopting a similar definition).  In other words, to determine whether Blanco "reside[d]" at the Parents' house, we must examine whether she lived there.

Applying that definition, the undisputed facts in the record show that Blanco did not "reside[]" at the Parents' house.  At all times, Blanco was one of three or four nannies who worked in shifts at the Parents' house.  Blanco arrived at the house on Sunday mornings, worked for 23 hours, and then worked four 14-hour shifts during the rest of the week.  So she was generally at the Parents' house for less than half of the week (79 out of 168 hours).  In between her five shifts, Blanco usually left the Parents' house and returned to the apartment she shared with her aunt to carry on with her own life.

And when she was at the Parents' house, Blanco was always working and on duty.  To be sure, Blanco slept at times during the night while she was on duty and the children in her room were fast asleep.  But even so, Blanco remained on duty at those times.  So if a child cried during the night, it was Blanco's job to immediately respond to that child.  In other words, though Blanco may have slept sometimes while the children slept, her time was not hers.  Indeed, the Parents paid Blanco to be on call for all the hours of her shift.  *See* 29 C.F.R. § 785.21 ("An employee who is required to be on duty for less than 24 hours is working even though [s]he is permitted to sleep or engage in other personal activities when not busy . . .  It makes no difference that she is furnished facilities for

sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime.").

To put an even finer point on it, the bed Blanco sometimes slept in—which, as we've noted, wasn't in her own space but in the same room as two of the children—wasn't even hers. She shared it with the two or three other nannies. Because the three or four nannies weren't all at the Parents' house at the same time, they effectively tag-teamed the single bed, each using that same bed on their own shifts. That is hardly a typical arrangement at one's own residence. And if the Parents were right, that would mean that all three or four nannies who shared that single bed in the children's room lived at the Blanco house, merely because they sometimes slept there. So on this record, the fact that Blanco sometimes slept in the shared bed, while the children in her care also slept, does not help the Parents' case that she "reside[d]" at their house.

Nor did Blanco spend any real leisure time at the house, and she kept few personal belongings there. So every time Blanco arrived for a shift, she had to bring an overnight bag and change of clothes with her.

From these facts, viewed in the Parents' favor, we cannot conclude that Blanco "reside[d]" at the Parents' house. No doubt Blanco worked at the house and spent significant time there. But that alone does not mean she "reside[d]" there any more than firefighters who sleep in fire-station dormitories while on duty reside at a fire station. The record contains no evidence that Blanco considered the Parents' house to be her own home. She maintained a

separate address and spent as much time away from the Parents'
house as she spent at the house.  She also did not usually spend any
time at the house between 9:00 a.m. and 7:00 p.m. on the days she
was scheduled to work.  Nor did she usually spend any time there
on Fridays or Saturdays after her weekly shifts ended.[9]   What's
more, Blanco did not even have her own key to the Parents' house.
In short, her behavior was inconsistent with "resid[ing]" there.

The Parents emphasize certain parts of the record to sup-
port their argument that Blanco "reside[d]" in their house.  We are
not persuaded.

First, the Parents stress that Blanco sometimes slept when
she tended to the children overnight.  We've already explained why
that doesn't help the Parents here.

The Parents also contend that Blanco "treated [their] home
as her residence" for three other reasons.  The Parents note that
Blanco (1) stored clothing, books, and papers in the nightstand,
kept an alarm clock on the nightstand, placed an open Bible in the
living room, and affixed religious paraphernalia around the house;
(2) regularly made breakfast for herself after the school-aged chil-
dren left for school; and (3) hosted guests from time to time.

To support the first aspect of their arguments, the Parents
submitted a declaration from one of the other nannies, Adrianna
Gomez.  More specifically, Gomez said that Blanco kept religious

---

[9] The lone exception occurred when Blanco agreed to cover the Friday or Sat-
urday shifts of the other nannies, which the record shows she did sometimes.

books, cosmetics, slippers, and socks in the children's room with the nannies' bed. Gomez also attested that the alarm clock in the bedroom belonged to Blanco. And Samuel said Blanco placed a fan and an air purifier by her bedside (though Blanco testified that the fan belonged to the Samuel family).

Blanco did not dispute that she placed certain items around the house. She testified at her deposition that she bought a protecting angel statute and gave it to the girls. She hung one rosary that belonged to her over the bed designated for her (and the other nannies) and another rosary that belonged to the family in the bedroom that the two older daughters shared. Blanco also opened a Bible to a particular verse to protect the home from illness. She testified that she did these things out of her concern for the girls and based on her Catholic faith, which she shared with Samuel.

Even after we credit Gomez's declaration and make all inferences in the Parents' favor, our conclusion remains the same: Blanco did not "reside[]" in the Parents' house, as the FLSA uses that term. That Blanco kept a few belongings at the Parents' house does not mean she treated the house as her residence. Just as many office workers keep personal effects—clothing, photos, religious items, and other personal mementos—at their place of employment, Blanco kept a few items in the bedroom where she spent much of her time at work.

And given that Blanco testified that she placed religious objects in the house to protect her charges, Blanco's display of a bible verse, a couple of rosaries, and an angel around the house are also

unremarkable.  She saw her placement of those items as helping her care for the children—what she was hired to do.  The presence of Blanco's few stray belongings didn't make her place of employment her residence.  Nor did the Parents' testimony about eating breakfast at the Parents' house or having an occasional houseguest turn their house into Blanco's residence any more than eating breakfast at the office or having a friend stop by an employee's workplace makes that workplace the employee's residence.

To establish that Blanco "reside[d]" at their home, or to create a genuine issue of material fact on this question, the Parents needed to submit additional evidence to suggest that she did, in fact, live there.  On this record, they have failed to do so.

By all accounts, Blanco maintained a separate residence at her aunt's apartment and returned there after her shifts were over.  That she worked long hours at the Parents' house does not mean she also resided there.  The common understanding of a "residence" precludes the conclusion that the Parents' house was Blanco's residence.

The Parents contend that our conclusion that Blanco did not "reside" in their house conflicts with the Second Circuit's decision in *United States v. Sabhnani*.  Even if *Sabhnani* were binding—it's not—we disagree that the two decisions are inconsistent.  In *Sabhnani*, the defendants forced two domestic workers to live in the defendants' house and work there for minimal wages.  599 F.3d 215, 224–32 (2d Cir. 2010).  Because the workers were brought to the United States from Indonesia and had nowhere else to go, the

Second Circuit concluded that they "reside[d]" at the defendants' house. *Id.* at 256–57. In contrast, here, Blanco spent only her paid work hours at the Parents' house and returned to her own apartment at the end of each of her shifts. She is not similarly situated to the workers in *Sabhnani*. Unlike those workers, she was not a permanent resident in the defendants' home for any period.

In sum, after reviewing the record and making all inferences in the Parents' favor, we conclude that Blanco did not "reside[]" in the Parents' house. For that reason, Blanco falls outside the FLSA's live-in service exemption, and she is entitled to overtime pay from her employer[10] for each hour she worked over forty hours per week.

2. *The Department regulations that the Parents cited do not establish that Blanco resided at the Parents' house.*

Our decision flows directly from the statutory text. Still, though, the Parents focus on Department regulations that they believe bear on the meaning of the term "resides." *See* Appellees' Br. at 9–37. We take a moment to explain why we conclude that, even considering these regulations, Blanco did not "reside" at the Parents' house.[11]

---

[10] As we discuss in Section III.B, a fact issue exists as to who or what entity was Blanco's employer.

[11] As we note in the first sentence of the paragraph above, we agree with our colleague Judge Hull that "the statutory text of the Fair Labor Standards Act . . . is unambiguous and dispositive of the issue on appeal." That said, the parties and the district court spent much time addressing the regulations as well.

In parts of the 1974 FLSA amendments, Congress expressly empowered the Secretary of Labor to define certain statutory terms through regulations. *E.g.*, 29 U.S.C. § 213(a)(15) (noting that exemptions apply to certain employees in "domestic service employment . . . as such terms are defined and delimited by regulations of the Secretary"); *see also Long Island Care*, 551 U.S. at 165 ("the FLSA explicitly leaves gaps" for the Department to fill "through rules and regulations"). Although Congress did not make such an indication for the term "resides," the 1974 amendments also included a broad, general grant of rulemaking authority, authorizing the Secretary of Labor "to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." Pub. L. 93-259, § 29(a); *see also Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1091 (D.C. Cir. 2015) (recognizing the Department's broad authority).

We begin by observing that the Department has promulgated regulations about live-in service workers. Still, though, none of those regulations expressly define "resides." But in regulatory materials, the Department has elaborated on its view of when a worker "resides" at her employer's premises.

In 2013, the Department promulgated a Final Rule further developing its interpretation of certain FLSA provisions, including the applicability of overtime provisions to domestic service

So while we don't need to address them because the statutory text answers our question, we think it makes sense to explain why, even if we considered the regulations, it would make no difference to the outcome here.

workers.  Application of the Fair Labor Standards Act, 78 Fed. Reg. 60,454 (Oct. 1, 2013) (codified at 29 C.F.R. § 552) ("2013 Final Rule").  In the preamble to the 2013 Final Rule,[12] the Department said it promulgated the Rule to "better reflect Congressional intent given the changes to the home care industry and workforce since that time."  78 Fed. Reg. at 60,454.  And "[t]he major effect of th[e] Final Rule," in the Department's view, was "that more domestic service workers w[ould] be protected by the FLSA's minimum wage, overtime, and recordkeeping provisions."  *Id.*

The preamble to the 2013 Final Rule addressed the statutory live-in service exemption found at 29 U.S.C. § 213(b)(21), the provision that governs here.  In the preamble, the Department explained that a person is a live-in employee if she "resides on [her] employer's premises on a 'permanent basis' or for 'extended periods of time.'"  *Id.* at 60,474 (citing 29 C.F.R. § 785.23; U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook § 31b20).

The preamble then provided guidance on what the Department meant by the phrase "extended period of time."  First, the Department considers whether the employee spends 120 hours or more on her employer's premises each week.  *Id.*  If so, the employee "resides" there.  For employees like Blanco who spend "less than 120 hours per week . . . working and sleeping on the employer's premises," the Department has explained, they may

---

[12] The preamble was not codified in the Code of Federal Regulations.

"reside" on the premises for an "extended period of time" if they spend "five consecutive days or nights" there. *Id.*

But as it turns out, the phrase "five consecutive days or nights" enjoys its own specialized meaning. To explain that phrase, the Department offered examples. The 2013 Final Rule stated that "employees who reside on the employer's premises five consecutive days from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights on the premises) would be considered to reside on the employer's premises for an extended period of time." *Id.* And "[s]imilarly, employees who reside on an employer's premises five consecutive nights from 9:00 p.m. Monday until 9:00 a.m. Saturday would also be considered to reside on their employer's premises for an extended period of time." *Id.*

The Parents focus solely on the part of this illustration that mentions "five consecutive nights." Then, noting that Blanco worked and slept at their house on Sunday, Monday, Tuesday, Wednesday, and Thursday nights, they argue that she satisfies the definition because she spent "five consecutive days or nights there."

We see two problems with this argument. First, the statutory language of section 213(b)(21) is not ambiguous, so we don't get to the Department's interpretation (which is not itself a regulation). And second, even if we applied the Department's interpretation, that would require the same conclusion that we reach: Blanco did not "reside" at the Parents' house. We explain each answer in turn.

Starting with whether the Department's interpretation is entitled to any deference, we find it is not. As we've discussed, our analysis of the statutory text compels the conclusion that Blanco did not "reside[]" in the Parents' house.

And even if we considered the language in the 2013 Final Rule, we could not ignore that the key language appears only in the preamble to the 2013 Final Rule rather than in the Department's regulations themselves. That distinction likely makes a difference. Definitions that appear in the preamble and the Federal Register but do not appear in the Code of Federal Regulations do not enjoy the force of law. *AT&T Corp. v. FCC*, 970 F.3d 344, 350 (D.C. Cir. 2020) ("[T]he real dividing point between the portions of a final rule with and without legal force is designation for publication in the Code of Federal Regulations." (citation and internal quotation marks omitted)).[13] After all, any definitions that appear in only a preamble have not undergone the notice-and-comment process, so they do not necessarily reflect the agency's considered position. *See id.* at 350–51; *cf. Wyeth v. Levine*, 555 U.S. 555, 580 (2009) (declining to defer to agency's preamble in part because it did not go through notice-and-comment).

To be sure, courts have recognized that a regulation's preamble can offer "evidence of an agency's contemporaneous

---

[13] As the District of Columbia Circuit has done, we "reserve[] a possibility that statements in a preamble may in some unique cases constitute binding, final agency action susceptible to judicial review." *AT&T Corp.*, 970 F.3d at 350 (internal quotation marks and citation omitted).

understanding of its proposed rules." *Wy. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999). And we have said that regulatory preambles can "provide[] some guidance" on the meaning of an agency's regulations. *Watkins v. City of Montgomery*, 775 F.3d 1280, 1284 (11th Cir. 2014). But we are unaware of any authority suggesting that the language an agency uses in a preamble should be awarded the same weight as if the agency chose to formally use the language in the regulation itself.[14] And without a definition of "resides" that appears in the Department's codified regulations, we do not conclude that the preamble to the 2013 Final Rule is dispositive here.

Still, though, we can consider the Department's definition of what it means to "reside" and work at an employer's premises for an "extended period of time" for any persuasive value it has. Because the Department's interpretation applies the plain meaning of section 213(b)(21)'s text, we find it has persuasive value.

That brings us to the second reason we must reject the Parents' argument that the Department's construction of "resides" supports them. As we've noted, the Parents homed in on the

---

[14] The Parents suggest that the Supreme Court's recent decision in *Bittner v. United States*, 598 U.S. 85 (2023), supports their argument that the preamble to the 2013 Final Rule can receive controlling weight. In *Bittner*, the Court considered a statute's enumerated purpose in its statutory-interpretation analysis and noted that "[a] preamble, purpose clause, or recital is a permissible indicator of meaning." 598 U.S. at 98 n.6 (citation omitted). But an agency regulation's preamble—that has not been through notice and comment—is not like a statute's enumerated preamble that Congress has affirmatively enacted.

preamble's language about "five consecutive nights" to argue that Blanco resided in their house. But this construction ignores part of the definition. It does not account for the context in which this phrase appears.

The language "five consecutive days from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights on the premises)" refers to an uninterrupted period of four-and-(roughly)-one-half consecutive 24-hour days (so a shift of five straight days that includes the four consecutive nights in between).[15] In the same way, the "five consecutive nights" language contemplates an uninterrupted period of four-and-(roughly)-one-half consecutive 24-hour days, but beginning with a night (so a shift of five consecutive nights that includes the four straight days in between). In other words, the preamble did not consider a period of "five consecutive nights" of duty, interrupted by the four intervening days off duty, to satisfy its illustration of the meaning of "an extended period of time," and thus "resid[ing]."

Given this language, it's perhaps unsurprising that the Department asserted precisely this interpretation in an amicus brief it

---

[15] As a reminder, the 2013 Final Rule stated that "employees who reside on the employer's premises five consecutive days from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights on the premises) would be considered to reside on the employer's premises for an extended period of time." 78 Fed. Reg. at 60,474. And similarly, "employees who reside on an employer's premises five consecutive nights from 9:00 p.m. Monday until 9:00 a.m. Saturday would also be considered to reside on their employer's premises for an extended period of time." *Id.*

filed here.  As the Department explained, this language from the preamble derives from a 1981 Opinion Letter from the Department's Wage and Hour Division.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter WH-505, 1981 WL 179033 (Feb. 3, 1981) ("1981 Opinion Letter").  In that letter, the Department clarified that an employee who spent an uninterrupted period of four days and five nights or four nights and five days (that is, a total of just under 120 hours straight) on the employer's premises qualified as one who "reside[d]" there, if "the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the" home. *Id.* at \*1–2.

> In making this point, the Opinion Letter stated,
>
> Employees who are on duty *from 9 a.m. Monday until 5 p.m. Friday* would also be considered to reside on the employer's premises.  Even though on duty for less than 120 hours, they are on duty for five consecutive days (Monday through Friday).  The fact that they sleep over only four nights does not matter.  Similarly, employees who are on duty *from 9 p.m. Monday until 9 a.m. Saturday* would also be considered to reside on their employer's premises since they are on duty for five consecutive nights (Monday night through Friday night).

*Id.* at \*2 (emphases added).  Here, Blanco did not remain at the Parents' house during the days between her consecutive nights on duty.  So under the preamble language, Blanco does not qualify as

30                        Opinion of the Court                    22-13669

having spent "an extended period of time" at the Parents' house. And as a result, she did not "reside" there.[16]

The Parents resist this conclusion. They cite other examples in Department regulatory materials for the proposition that an employee can leave her employer's premises while she is off duty and still "reside" there. And of course, that is true. But none of the examples the Parents cite help them.

For starters, the Parents' examples are not designed to assess when an employee "resides" at the employer's premises. Rather, the Department created them to illustrate when an employee must be paid for hours they are not actually working. That issue is not before us.

Take the first example the Parents cite. It involves a live-in direct-care worker who assists her roommate in the morning, leaves the residence to attend classes, and then returns "home" to the premises in the evenings where she spends time further assisting her roommate but also spends time studying, watching television, and doing her laundry. 78 Fed. Reg. at 60,492. This example, which comes from a different part of the preamble to the 2013 Final Rule, explains that "the hours spent engaged in personal pursuits are considered bona fide off-duty time and are not

---

[16] We need not consider whether the language of the Opinion Letter offers another reason why Blanco didn't "reside" at the Parents' house: the bed she shared with the other nannies was not "separate from" the quarters of the children she cared for. In any event, it's clear for the other reasons we've identified that Blanco did not "reside" at the Parents' house.

compensable hours." *Id.* But that tells us nothing—and is not intended to tell us anything—about the issue we must address: whether Blanco "reside[d]" at the Parents' house. And even if we could squeeze out some relevance to our issue, it wouldn't help the Parents. Unlike in Blanco's case, the hypothetical worker apparently lives full-time at the premises. And even if she doesn't, it's clear she spends significant time in pursuit of her own interests, needs, and leisure there. Blanco did not.

The Parents also invoke a Department Fact Sheet that envisions a live-in domestic service worker who assists her disabled employer in the mornings, leaves the residence to work at a different part-time job while her employer works at his own job, and then returns to the home with her employer where she provides additional care until he retires for the evening. U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #79D: Hours Worked Applicable to Domestic Service Employment Under the Fair Labor Standards Act (FLSA) (Apr. 2016). But again, this example contemplates that the "employee . . . lives on the employer's premises." *Id.* The Department offers the example only to show that "[a]n employee who lives on the employer's premises is not necessarily considered working all the time he or she is on the premises." *Id.* That's not at issue here, so this example is not helpful.[17]

---

[17] The Parents rely on several other regulatory documents that the Department has published over the past few decades, which they say support their argument that Blanco "reside[d]" in their house. These include the following: U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation No. 2014-1 (Nov. 17, 2016); U.S. Dep't of Labor, Wage & Hour Div., Field Assistance

Besides these materials, the Parents cite the Eighth Circuit's decision in *Bouchard v. Regional Governing Board of Region V Mental Retardation Services*, 939 F.2d 1323 (8th Cir. 1991). But *Bouchard* does not alter our determination. There, the employees not only worked at the employer's facility but also spent off-duty time sleeping there. *Id.* at 1330–31. So the few hours they spent away from the employer's premises each day did not change the conclusion that they resided at their employer's facility. *Id.* As we've explained, Blanco did not spend any off-duty time at the Parents' house. Rather, she returned to her aunt's apartment during the daytime hours.

---

Bulletin No. 2016-1 (Apr. 25, 2016); U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #79B: Live-in Domestic Service Workers Under the Fair Labor Standards Act (FLSA) (Sept. 2013); U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook, §§ 31b20, 25n02(c)(2); and U.S. Dep't of Labor, Wage & Hour Div., Enforcement Letter, 1988 WL 614199 (June 30, 1988). We do not discuss these documents further because they use similar language to the 2013 Final Rule. In fact, the 2013 Final Rule cited many of these documents, and the Department noted there that it "did not propose any changes to the definition of live-in domestic service employee or otherwise discuss the requirements for meeting the live-in domestic service exemption[.]" 78 Fed. Reg. at 60,474. In other words, the Preamble to the 2013 Final Rule repeated the same standards the Department had used in the cited materials to determine whether an employee is a live-in service worker. So for the same reasons the language in the 2013 Final Rule supports Blanco's argument that Blanco did not reside in the Parents' house, that same language in the other sources the Parents cite also counsels against their position.

In sum, we agree with the Department's interpretation of the preamble to the 2013 Final Rule. But that's because it is consistent with the plain meaning of the statutory text.

And even if the statutory text were ambiguous—we don't think it is for the reasons we've explained—we would value the Department's interpretation only for its "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). As the Supreme Court explained, the "general rule . . . is not to give deference to agency interpretations advanced for the first time in legal briefs," unless the interpretation reflects the agency's "fair and considered judgment on the matter in question." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.6 (2019) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)). Here, we would not defer to the Department's position in its amicus brief but instead evaluate the weight of the Department's judgment based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements," among other factors. *Skidmore*, 323 U.S. at 140. The Department's reliance on decades of its own formal interpretations of what it means to "reside" on an employer's premises reflect the breadth and depth of its consideration of the issue before us. *See id.* So we would find the Department's brief to be persuasive if we had to look past the statutory text.

All told, the Department's applicable regulations and interpretive documents establish that Blanco did not "reside[]" in the Parents' house. So even under this analysis, Blanco would not be

exempt from overtime pay under the FLSA's live-in service exemption, and the Parents were not entitled to summary judgment.

In sum, as to overtime pay for Blanco, we vacate the district court's grant of summary judgment in favor of the Parents, reverse the district court's denial of Blanco's motion for summary judgment, and conclude Blanco is entitled to overtime pay.

### B.  A factual dispute exists over whether the Parents were Blanco's employer.

The Parents argue that, if Blanco is entitled to overtime pay, they are not responsible for paying her overtime wages because they were not her "employer" as the FLSA defines that term.  *See* 29 U.S.C. § 207 (requiring only an "employer" to pay overtime wages).  Rather, the Parents assert, Blanco's actual employers were the two LLCs: Nannies with Love and Amazing Gracie.

The district court found a genuine dispute of material fact as to whether the Parents were Blanco's employer.  Blanco appeals that decision and asks us to enter summary judgment in her favor. We cannot do that because we agree with the district court.

As we've explained, on review of an order on summary judgment, we apply the same standards as the district court.  So on this separate issue we must view the record in the light most favorable to the Parents and make all inferences in their favor. *Feliciano*, 707 F.3d at 1252.  And when we do that, we must conclude that a genuine dispute of material fact exists and precludes summary judgment.

Under the FLSA, to "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). And the definition of "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id*. § 203(d). The Supreme Court has described the definition of "employ" as one with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)). We have said that the "statutory 'suffer or permit to work' definition is one of the broadest possible delineations of the employer-employee relationship." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1287 (11th Cir. 2016) (quoting 29 U.S.C. § 203(g)).

"[U]nder this expansive approach, an entity is deemed to employ a worker where, as a matter of 'economic reality' and under all the circumstances, the worker is 'economically dependent' on the hiring entity." *Id*. (quoting *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994)). Any label the parties may place on their relationship and any contracts that may govern that relationship do not control whether an employer-employee relationship exists. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). Rather, we answer that question by homing in on "whether 'the work done, in its essence, follows the usual path of an employee.'" *Id*. (quoting *Rutherford Food*, 331 U.S. at 729).

To help us determine whether an entity qualifies as an "employer" under the FLSA's "suffer or permit to work' standard," we

consider the eight *Aimable* factors.  *Garcia-Celestino*, 843 F.3d at 1294.  Those factors include the following:

> (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of facilities where work occurred; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities.

*Id.* (alterations adopted) (citation and internal quotation marks omitted).

We've also outlined five overarching principles that inform our application of the *Aimable* factors.  First, "in joint employer cases, rather than fixating on whether the worker is relatively more dependent on one putative employer than the other," we "focus on the worker's relationships with each putative employer."  *Id.* (citations omitted).  Second, "no one factor is dispositive" in this analysis.  *Id.*  Third, the weight we give to each of the eight *Aimable* factors "depend[s] upon the extent to which it is probative of the worker's economic dependence on the putative employer under the circumstances."  *Id.*  Fourth, our review is not an exercise in addition and subtraction.  Rather, we consider the evidence "holistically and qualitatively."  *Id.*  Fifth and finally, we've recognized that

"common law principles of employment have no bearing" on the analysis. *Id.*

Before we apply the *Aimable* factors to Blanco's case, we reiterate that, at this stage, we must view the record in the light most favorable to the Parents and make reasonable inferences in their favor. As we've emphasized, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

The Parents disclaim any involvement with controlling, supervising, hiring, firing, and paying the nannies. Dr. Finch (the children's mother) testified at her deposition that she could not recall giving any of the nannies any directions about how to care for her children. Nor did Dr. Finch know any details about Blanco's responsibilities and duties within the house. The only job requirement, from Dr. Finch's perspective, was that an adult would come to the house to care for the children.

Dr. Finch also swore in her declaration that she "did not control or supervise Ms. Blanco to any meaningful degree." She attested that she "outsourced all aspects of the nanny operations including scheduling, payroll and regulatory compliance" to the LLCs. Dr. Finch's only role, she claimed, was to "indicate[] to the agency the coverage [she] needed (i.e., what hours [she] needed a nanny)." But she "did not direct who among the nannies appeared at any particular time, or what specific duties each nanny had (such

as preparing meals, bathing, dressing for school or for bed, etc.)." The Parents also represented that they "had no operational control over, and knew little about" Amazing Gracie.

Nor did the Parents "determine the rate and method of payment each week," according to Dr. Finch. And they did not know how much each nanny was paid. Dr. Finch attested that she generally paid Amazing Gracie one lump sum of around $2,400 each week without any knowledge of which nanny received which amount.

Dr. Finch also disclaimed any involvement in hiring and firing Blanco. In fact, at her deposition, Dr. Finch testified that she did not know how Blanco came to work for the family. And she said that Blanco's departure stemmed from her own abandonment of the job.

But other record evidence creates disputes about the Parents' degree of control over the nannies. For example, Grace Trask—one of the nannies and the principal of Amazing Gracie—testified at her deposition that she did not tell the other nannies what to do or otherwise supervise them, and that she did not have the right to discipline or fire them. Trask also testified that the Parents gave instructions about caring for the children, such as which activities were scheduled and which tasks needed to be done around the house. And though Trask knew that she paid Blanco $880 per week, she did not know how that amount was calculated. Rather, Trask explained, it was simply the same amount that Blanco had been making previously.

Still, some undisputed facts exist about an eight-week period in which the nannies were not affiliated with an LLC. At some point, Toribio and her LLC, Nannies with Love, which ostensibly employed the other nannies as well, parted ways with the Parents. When that happened, the nannies ceased their affiliation with Nannies with Love. And an eight-week period ensued in which no LLC even possibly employed the nannies who continued to work for the Parents, including Blanco and Gomez. During that period, Dr. Finch acknowledges that she paid the nannies directly by personal check.[18] And over that interval, the only possible supervisors for the nannies were the Parents themselves. That regime continued until the Parents hired Trask and Trask formed Amazing Gracie. Even then, though, the Parents entirely funded Amazing Gracie, and the LLC neither had any other clients nor retained any profits.

In short, the Parents claim that all the nannies at first worked exclusively for Nannies with Love until the remaining nannies separated from Nannies with Love and continued to work for the Parents. Then, after an eight-week gap in which the Parents were responsible for supervising and paying the nannies, a new entity—Amazing Gracie—emerged, hired both Blanco and Gomez, and became their exclusive employer. At that point, according to the Parents, Amazing Gracie assumed all oversight of the nanny operation

---

[18] The Parents—who are both licensed attorneys—say that, around this time, they researched the FLSA's overtime requirements and determined that Blanco was exempt under the live-in service exemption.

and the Parents once again removed themselves and transferred childcare responsibilities to an entity they "knew little about."

As the Parents tell it, they did no independent vetting of the nannies who entered their home to watch their children, gave no directions as to the nannies' duties and responsibilities, and paid little to no attention to the nannies' work in their home. And while the Parents acknowledge that, for an eight-week period, they paid the nannies directly, they maintain that this was the "lone exception" to their general practice of detachment from the nannies' day-to-day care for their children.

No matter which version of the events may seem more plausible, under the summary-judgment standard, it is not our role to assess the credibility of the Parents' assertions. *Butler*, 41 F.4th at 1334. If the Parents submit evidence that raises a genuine dispute of material fact, then we must send the question to a jury to evaluate the parties' credibility. *See id.* Here, the Parents have submitted sworn testimony and declarations, under penalty of perjury, indicating that they had minimal oversight over the nannies' care for their children. So we must conclude that a genuine dispute of material fact exists about whether the Parents exercised control and supervision over the nannies' work in their house. And a jury must decide whether the Parents were Blanco's employer and are therefore responsible for paying her overtime compensation.[19]

---

[19] Because a genuine dispute of material fact exists about whether the Parents were Blanco's employer, we need not and do not address the Department's

Before concluding, we briefly address the parties' contentions regarding damages. In the district court, the Parents argued that Blanco is not entitled to liquidated damages under 29 U.S.C. § 216(b). They invoked the FLSA defense that applies if the employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . ." 29 U.S.C. § 260. If, on remand, the district court ultimately considers whether the Parents acted in good faith under § 260, it should evaluate the credibility of, and if appropriate, account for the Parents' representations to the court that they effectively had no supervision or control over the nannies' care for their children.[20]

## IV.    Conclusion

For all these reasons, we conclude that Blanco did not "reside" in the Parents' house and that she is entitled to overtime pay. As a result, we must vacate the grant of summary judgment to the Parents on that issue. But because a genuine dispute of material fact remains as to who must pay that overtime—that is, whether the Parents were Blanco's "employer"—we affirm the district

---

argument that the Parents and the LLCs were Blanco's joint employers. That question also turns on a genuine dispute of material fact.

[20] The cover page of Blanco's brief indicates that she seeks to bring this action on behalf of all employees similarly situated under 29 U.S.C. § 216(b). Because no others are plaintiffs and Blanco has not developed this point in any of her briefing, we do not consider or discuss it further.

court's denial of summary judgment in favor of Blanco on that "employer" issue.  We remand for further proceedings consistent with this opinion.

**REVERSED AND VACATED IN PART; AFFIRMED IN PART; and REMANDED IN PART.**

22-13669          HULL, J., Specially Concurring                    1

HULL, Circuit Judge, specially concurring in part:

I concur in the Court's opinion in full, except for Section III.A.2 concerning the Department of Labor's (the "Department") "regulations" and materials discussed in that Section. In my view, the statutory text of the Fair Labor Standards Act, discussed in Section III.A.1, is unambiguous and dispositive of the issue on appeal. I would not give any deference or persuasive value to the preamble of the Department's 2013 Final Rule or other materials discussed in Section III.A.2.